## UNITED STATES v. R. P. ANDREWS & COMPANY.

### APPEAL FROM THE COURT OF CLAIMS.

No. 44. Argued November 8, 11, 1907.—Decided December 2, 1907.

Whether the Philippine Islands are a distinct governmental entity for whose contracts the United States is bound, not decided; but *held* in this case that the purchase having been made by the Secretary of War through the Division of Insular Affairs, the contract was on behalf of the United States, notwithstanding the statement that the price was to be paid from Philippine funds.

Delivery of goods by a consignor to a common carrier for account of a consignee amounts to a delivery and where a purchaser directs delivery of the goods for his account to a designated carrier the latter becomes his agent. Delivery by the consignor, and acceptance by the consignee or his agent, of bills of lading issued by a common carrier for goods, constitutes a delivery.

While the presumption of delivery of goods to the consignee by delivery to a common carrier designated by him may be overcome by express contract that the goods are to remain at consignor's risk until arrival at ultimate destination, the mere statement in a government proposal that goods are to be " F. O. B. port of destination," without designating the carrier, is not sufficient to rebut that presumption where it appears that subsequently the government directed the goods to be delivered " F. O. B. port of shipment " to a designated common carrier.

The invalidity of a contract with the United States because not reduced to writing and signed by the parties with their names at the end thereof as required by § 3744, Rev. Stat., is immaterial after the contract has been performed. *St. Louis Hay Co. v. United States,* 191 U. S. 159.

41 C. Cl. 48, affirmed.

THE facts are stated in the opinion.

*Mr. Assistant Attorney General Van Orsdel*, with whom *Mr. Charles F. Kincheloe* was on the brief, for appellant:

The Philippine Islands were, at the time of the making of this contract, a distinct political territorial entity, having practically as complete a civil territorial government as had any of the organized continental Territories of the United States. The United States was therefore no more liable on this contract of the Philippine Government than it would be upon a similar contract made by the government of the Territory of New Mexico or of Arizona.

The National Government is not liable on a contract or other obligation of one of its territorial governments, or of a political subdivision of such territorial government, even though the obligation be authorized by Congress. *National Bank* v. *Yankton County*, 101 U. S. 129; *Barnes* v. *District of Columbia*, 91 U. S. 540; *Mills* v. *Commissioners of Hendricks Co.*, 50 Ind. 436.

While according to commercial usage, delivery by a vendor to the carrier is, in the absence of special agreement to the contrary, delivery to the vendee, yet no one will question the right and power of the parties to vary this rule by contract provisions requiring delivery to be made by the vendor at the point of final destination. *Dunlop* v. *Lambert*, 6 C. & F. 620–622; *Pacific Iron Works* v. *L. I. R. R. Co.*, 62 N. Y. 272. No matter how the contract in the case at bar may be construed, it called for delivery f. o. b. Manila.

As the contract called for delivery at Manila, the contractor has no right of recovery, as it is well settled that in contracts for the sale and delivery of property the risk of damage or loss of the property follows the title. *Grant* v. *United States*, 7 Wall. 331; *Oil Company* v. *Van Etten*, 107 U. S. 325, 333; *McConihe* v. *R. R. Co.*, 20 N. Y. 497. The title does not pass until delivery is made according to contract. *Grant* v. *United States*, 7 Wall. 331; *Pacific Iron Works* v. *L. I. R. R. Co.*, 62 N. Y. 272; *Magruder* v. *Gage*, 33 Maryland, 348; *Blackwood* v. *Cutting*, 76 California, 212. The risk is therefore in him who

undertakes to deliver. Am. & Eng. Ency. (2d ed.), Vol. 24, p. 1050; Benjamin on Sales, §§ 330, 693; *Grant* v. *United States,* 7 Wall. 331; *Buckingham* v. *Dake,* 112 Fed. Rep. 258; *Pacific Iron Works* v. *L. I. R. R. Co.,* 62 N. Y. 272; *Taylor* v. *Cole,* 111 Massachusetts, 363; *McConihe* v. *N. Y. & E. R. R. Co.,* 20 N. Y. 496; *Dunlop* v. *Lambert,* 6 C. & F. 620–622; *Castle* v. *Playford,* 5 Ex. L. R. 165.

If the United States Government be held a principal party to the transaction, the contract was in violation of law, and void, on account of its not having been reduced to writing and signed by the parties in accordance with § 3744 Revised Statutes, and there can therefore be no recovery on the contract. *Clark* v. *United States,* 95 U. S. 539; *South Boston Iron Co.* v. *United States,* 118 U. S. 37.

And while there would have been a right of recovery upon a *quantum valebant* if the paper had been delivered to and accepted and used by the government, yet there was never any legal delivery, or any acceptance or use whatever of the paper by the government, at Manila or elsewhere, and there is therefore no ground for recovery even upon a *quantum valebant.* *Clark* v. *United States* and *South Boston Iron Co.* v. *United States, supra; Monroe* v. *United States,* 184 U. S. 524; *St. Louis Hay and Grain Co.* v. *United States,* 191 U. S. 159.

*Mr. A. A. Hoehling, Junior,* for appellee, submitted.

MR. JUSTICE WHITE delivered the opinion of the court.

The United States appeals from a judgment against it (41 C. Cl. 48), for the contract price of paper purchased for use in the public printing office in the Philippine Islands. We summarize from the findings the status of the Philippine Islands at the time of the contract, stating besides the facts concerning the organization in the War Department of what is now known as the Bureau of Insular Affairs.

After the occupation of Manila, up to September 1, 1900, a

military government prevailed. From September 1, 1900, to July, 1901, authority of a legislative nature was vested in the Philippine Commission, under and subject to rules and regulations to be prescribed by the Secretary of War. From July 4, 1901, the executive authority as to civil affairs was transferred to the president of the Philippine Commission under the title of Civil Governor, his authority being exercised under instructions from the President, subject to the direction and control of the Secretary of War. The Secretary of War organized the Division of Insular Affairs, which was given general charge of departmental business concerning the Philippine Islands. The organization of the division was confirmed and ratified by Congress on July 1, 1902 (32 Stat. 712), and after that act the division became known as the Bureau of Insular Affairs of the War Department. The facts concerning the contract in controversy are these:

In May, 1901, the president of the Philippine Commission telegraphed the Secretary of War, stating the necessity for a government printing office at Manila, asking concerning the qualifications of a particular individual suggested for superintendent, and recommending the immediate purchase and shipment of an outfit for the proposed printing office. The findings expressly state or by clear implication establish the following:

In response to said cablegram, the Secretary of War directed the Insular Bureau of the War Department to purchase and forward to Manila the necessary machinery, equipment, and supplies for the establishment and operation of such printing office, and also to secure the services of a competent force of operators therefor; which duty was performed by said division.

On and prior to August 17, 1901, claimant was furnishing and supplying defendants divers papers and stationery, under contract, for use in various of its departments; and, thereupon, the chief of the Division of Insular Affairs solicited claimant to furnish and supply, for use in said Philippine Public Printing Office, being established at Manila, Philippine Islands, certain papers of described kinds, as follows:

"(Circular D.)

"War Department, Office of the Secretary,
                "Division of Insular Affairs,
                        "Washington, D. C., August 17, 1901. ·

"R. P. Andrews & Co.,

                "627 Louisiana avenue, Washington, D. C.

"Gentlemen: Under instructions from the Chief of Division of Insular Affairs I write you as follows:

"Will you furnish for the use of the Philippine Public Printing Office, Manila, P. I., articles called for in the inclosures 1 and 2 F. O. B., Manila, at the price at which the same is now furnished to the Government Printing Office, Washington, D. C., plus freight from New York; payment to be made from Philippine funds on invoice verification at Manila, P. I.

"Inspection at Insular Division, where samples are to be sent.

"When can supplies be shipped from port of departure?

"Bills for supplies to be submitted, in duplicate, to the Chief of Division of Insular Affairs, for verification of prices at Government Printing Office rates.

"Copies of bills of lading from New York to be submitted, in duplicate, to Chief of Division of Insular Affairs for verification.

                "Very respectfully,"

                        III.

In reply claimant, on August 28, 1901, submitted a proposal as follows:

                "Washington, D. C., August 28, 1901,

"Chief of Division of Insular Affairs,

                "War Department, City.

"Dear Sir: Replying to your favor of the 17th instant, Circular D, we beg to advise you that we will furnish the different lots of paper called for in inclosures 1 and 2, which accompanied said circular, at the prices for which the same is now being furnished to the Government Printing Office, Washington, D. C., plus freight rate from New York to Manila, P. I.,

except lots. . . . All other lots mentioned we will, as stated above, furnish at the same prices that the same class of goods are being furnished to the Government Printing Office, plus, as stated above, the freight from New York to Manila, P. I. Payment to be made from Philippine funds on invoice verification at Manila, P. I. Inspection at Insular Division, where samples are to be sent. Bills for supplies to be submitted in duplicate to the Chief of Division of Insular Affairs for verification of prices at Government Printing Office rates. Copies of bills of lading from New York to be submitted in duplicate to Chief of Division of Insular Affairs for verification.

"We can have the goods ready for shipment October 1st to November 15th."

### IV.

On the same date (August 28, 1901), said Chief of the Division of Insular Affairs wrote claimant as follows:

"(Circular E.)

"War Department, Office of the Secretary,
"Division of Insular Affairs,
"Washington, D. C., August 28, 1901.

"R. P. Andrews & Co.,
"627 Louisiana avenue, Washington, D. C.

"Gentlemen: Please deliver F. O. B. Manila, P. I. (via Suez Canal), the following:

"Articles called for in inclosures 1 and 2.

"To be shipped between October 20 and November 1, 1901.

"Quality of goods furnished will be considered in making future orders.

"Please acknowledge the receipt of this circular by return mail.

"To be properly packed for export shipment.

"Ship care Barber & Co., steamship agents, Pier B, Pennsylvania docks, Jersey City, N. J. (See note inclosed.)

"Marked as follows:

"No.      , Governor W. H. Taft, Manila, P. I.

"Contents,        ; weight,      lbs.

"For Philippine public printing plant.

"As per your agreement in your letter dated August 28, 1901, now on file in this office.

                    "Very respectfully."

The inclosures marked 1 and 2, referred to in this letter, were statements tabulating the quantity and quality of paper to be furnished. The note referred to and inclosed in the letter was the following:

"Note.—(Care Barber & Company, steamship agents, Pier

            B, Pennsylvania docks, Jersey City, N. J.)

"A special arrangement has been made so that after F. O. B. delivery, as above, at Jersey City, the freight rate for the transportation of these supplies and the equipment of the Manila Printing Office will not be higher than $11.05 per ton (dead weight) and possibly less. Rate for measurement freight to be made on a correspondingly low basis, in accordance with the space occupied. Therefore the Philippine government will, upon invoice verification at Manila, reimburse you for the cost of this ocean shipment."

Before the paper was shipped the Division of Insular Affairs gave further instructions as follows:

"Note.—(Care Barber & Company, East Central Pier, Brook-

                    lyn, N. Y.)

"A special arrangement has been made so that after F. O. B. delivery, as above, at Brooklyn, the freight rate for the transportation of these supplies and equipment of the Manila Printing Office will not be higher than $11.05 per ton (dead weight) and possibly less. Rate for measurement freight to be made on a correspondingly low basis, in accordance with the space occupied. Therefore the Philippine government will, upon invoice verification at Manila, reimburse you for the cost of this ocean shipment."

The findings relating to the value of the paper, its forwarding to and arrival of a part at Manila, and the subsequent controversy between Andrews & Co. and the Government concerning the same, show the following to be the case.

In compliance with the directions Andrews & Co. packed the paper for export shipment, directing it to Governor W. H. Taft, Manila, Philippine Islands, in care of Barber & Co., East Central Pier, Brooklyn, N. Y., and prepaid the freight. The quoted value of the paper was $3,087.75. The freight charges from New York to Manila were $196.35, which, together with one dollar for clearance papers, prepaid by Andrews & Co., brought the total purchase or invoice price to $3,285.10. When the paper was delivered to Barber & Co., Andrews & Co. took triplicate bills of lading, consigning the paper to Governor W. H. Taft or his assigns, Manila, Philippine Islands, and delivered the duplicate bills of lading to the Chief of Division of Insular Affairs, in accordance with the instructions given. Barber & Co. forwarded the paper by the steamship Indrasamaha. When the vessel arrived at Singapore it was found that a portion of her cargo, including the consignment of paper, was badly damaged by water. Some of the paper was condemned by a board of survey convened by the agents of the ship, and was sold in Singapore. The remainder was repacked and forwarded to Manila. When it arrived it was so damaged as to render it unfit for use. The consignee (Governor Taft) refused to accept it, and a committee, which was appointed by him as Civil Governor, recommended that the paper be stored in a warehouse of the Philippine government until instructions were received from Andrews & Co., who had no agent in the islands. Thereupon the Public Printer of the Philippine Islands wrote Andrews & Co., informing them of the facts just stated, and asking instructions as to what they wished done, and on May 31, 1902, the Division of Insular Affairs also wrote Andrews & Co. on the same subject as follows:

"War Department, Office of the Secretary,

"Division of Insular Affairs,

"Washington, D. C., May 31, 1902.

"Gentlemen: I have the honor to inform you that a letter dated April 14th, 1902, has been received from Mr. John S. Leech, public printer, Manila, P. I., advising this division of the

accident which occurred to the S.S. "Indrasamaha," which resulted in damaging 500 reams linen paper, valued at $3,285.10, as per your bill of October 24th, 1901.

"Mr. Leech requested that you be informed that the paper is damaged so badly that it will be impossible to use any of it; that an insurance inspector and a Government inspection committee were then surveying and inspecting the damaged goods, and that this action was taken for the protection of the contractors, who had taken the precaution to insure their goods against losses.

"Very respectfully."

Andrews & Co. thus replied to this letter:

"Washington, D. C., June 7, 1902.

"Lieut. Col. Edwards,

     "Chief Division of Insular Affairs,

         "War Department, Washington, D. C.,

"Dear Sir: We are in receipt of your favor May 31st, No. 5423–1, quoting letter received from Mr. John S. Leech, public printer, Manila, P. I., with regard to map paper, therein stated to have been damaged in transportation on steamship 'Indrasamaha.'

"This paper was shipped as per your order, bills of lading being obtained as directed, and your instructions carried out implicitly. Your goods were turned over upon direction of your office to Messrs. Barber & Company, your agents in that behalf at Jersey City, N. J., in good order and condition, whereupon our responsibility ceased.

"We have the honor, therefore, to request that our bill as rendered be approved for payment.

"Kindly advise us also whether you desire us to make a duplicate of said shipment.

"Requesting the favor of an early reply, we are, very respectfully yours."

The shipment of paper was not insured either by the Government or by Andrews & Co. The proceeds of the sale at Singapore never reached either the Government or Andrews & Co.,

and the paper stored at Manila remained there until May, 1903, when it was sold, producing a sum insufficient to pay the storage charges, and the proceeds were turned into the treasury of the government of the Philippine Islands in partial payment of the charges.

All the propositions which the Government has elaborately pressed at bar are reducible to two.

First. That the paper was purchased by the Government of the Philippine Islands, and therefore in any event there was error in holding the United States liable.

Second. That even if the United States was the purchaser, it was erroneously held liable, because the paper was never delivered, and therefore was at the risk of the owner, Andrews & Co., and the loss and damage fell upon them.

We proceed to consider these propositions:

1. We need not consider the contention that the Philippine Islands were a distinct governmental entity for whose contracts the United States was not bound, because that subject is irrelevant, since it begs the real question—that is, whether the purchase was made by the United States. Testing whether the paper was bought by the United States by the contract and course of dealing as disclosed by the findings, we think there is no escape from the conclusion that the United States was the party contracting for the purchase. It cannot be doubted that the findings make clear the fact that the Secretary of War, through his agent, the Division of Insular Affairs, was the actor on one side and Andrews & Co. on the other. Nothing in the dealings as disclosed by the findings would warrant the conclusion that the Division of Insular Affairs acted or purported to act as the agent of the government of the Philippine Islands. The telegram to the Secretary of War, which opened the subject, did not even suggest a contract to be made in the name of the government of the Philippine Islands, but simply submitted recommendations to the Secretary of War for his action, accompanied with the request that if the recommendation was favorably considered he, the Secretary of War,

should make the purchase desired. In the second place, the Division of Insular Affairs undertook the negotiation under an order of the Secretary of War, directing that the paper required be purchased, without an intimation that it was contemplated that the Division of Insular Affairs in executing the authority conferred should act as the agent of the government of the Philippine Islands, instead of as the representative of the Secretary of War, as a result of the authority vested in him. The first letter written on the part of the Division of Insular Affairs to Andrews & Co., soliciting a proposal to furnish the paper, we think manifests that the purpose of the division was to make the purchase for the United States in accord with the direction under which the division was acting—that is, the authority of the Secretary of War acting for the United States. True it is the letter made it clear that the paper which the United States proposed to purchase was intended for use in the Philippine Islands, and contained a statement that the price would be "paid from Philippine funds." But the mere statement of the purpose for which the paper was intended would not justify the conclusion that the Division of Insular Affairs was acting as the mere agent of the government in the Philippine Islands, instead of as the agent of the Secretary of War representing the United States. The statement of the fund from which the payment was to be made, instead of justifying the inference that the contract was intended to be made in the name of the government of the Philippine Islands, through its agent, gives countenance to a contrary inference. This follows because if the government of the Philippine Islands was the contracting party its funds would, as a matter of course, be the source from which the payment was to be made. The reference, therefore, to the fund from which the payment was to be made but served to indicate that the United States, in making the contract, contemplated that the purchase price would be discharged by it from the Philippine funds under its control. That Andrews & Co., when they replied to the inquiry made to them as to price, etc., understood that the contract proposed was on behalf of

the United States we think is deducible from their reply. Besides, the subsequent correspondence and dealings which we shall hereafter consider in determining whether the paper was delivered under the contract prior to the happening of the damage, we think will serve to make clear the fact that both parties deemed the contract was one made in the name of and for account of the United States. Especially is this so when it is borne in mind that the findings either directly or by necessary implication establish that in October, 1901, soon after the goods were shipped, a bill for the amount of the total purchase price, including the freight to Manila, was rendered by Andrews & Co. to the Division of Insular Affairs, and there is nothing in the findings warranting even an implication that that division made any objection upon the ground that the bill should have been made out against the Philippine government as the purchaser and have been transmitted to that government for payment. Yet further, it is apparent from the letter written by the division to Andrews & Co., after it was learned that the paper had been damaged or lost, that the Division of Insular Affairs was solicitous, not because a bill had been mistakenly rendered, but as to whether the loss should fall upon the United States or upon Andrews & Co.

2. That as a general rule the delivery of goods by a consignor to a common carrier for account of a consignee has effect as delivery to such consignee is elementary. That where a purchaser of goods directs their delivery for his account to a designated carrier, the latter becomes the agent of the purchaser, and delivery to such carrier is a legal delivery to the purchaser is also beyond question. Certain also is it that when on the delivery of goods to a carrier bills of lading are issued for the delivery of the goods to the consignee or his order, the acceptance by the consignee of such bills of lading constitutes a delivery. Of course the presumption of delivery arising from the application of any or all of these elementary rules would not control in a case where by contract it clearly appeared that, despite the shipment, the goods should remain at the risk

of the consignor until arrival at the point of ultimate destination. And such in effect is the contention here made on behalf of the Government. We come briefly then to consider the findings concerning the contract for the purpose of showing that this contention is without merit.

In considering the matter it is to be conceded that the contract is not to be deduced alone from the letter of the Division of Insular Affairs of May 31, 1901, and the reply of Andrews & Co. of June 7, but is to be ascertained by a consideration of those letters and the subsequent correspondence under which the purchase was concluded and the shipment made.

The statement in the proposal of the Division of Insular Affairs of August 17, 1901, by which the negotiation was commenced, " F. O. B. Manila," might give rise, if standing alone, to the implication that it was intended that the goods should be delivered at the cost of the seller at Manila. But the further statement in the letter, that the freight from New York to Manila was to be a part of the purchase price and to be paid as such by the purchaser, rebuts the implication that the words " F. O. B. Manila" were understood as implying that the amount of the freight charges for the shipment of the goods to Manila should be at the cost of the seller. These words not therefore having been used in their ordinary commercial sense, their meaning must be sought in the context of the proposal in which they are found. Considering that context, it would seem most reasonable to conclude that the words implied that, as the Government desired the freight to Manila to be included in the purchase price, the freight therefore to Manila was to be primarily defrayed by the seller. That this was the understanding of Andrews & Co. we think results from their reply, in which no reference whatever was made to the F. O. B. Manila clause, but a willingness was expressed to furnish the paper at a price to be fixed by the price paid by the Government in Washington for like paper, with the addition of the freight rate to the Philippine Islands, thereby saving the seller from bearing the burden of the freight to Manila, and at the same time securing

to the Government the delivery of the paper at Manila without the payment there to the carrier of the cost of the freight as such, since that item would become a part of and be included in the price. It is certain, when the subsequent correspondence is considered, that this construction, which the reply of Andrews & Co. put upon the words "F. O. B. Manila," as used in the proposal, was deemed by the Division of Insular Affairs to be the correct one, since that reply was in the subsequent correspondence treated by the division as being directly responsive to and an acceptance of the proposal submitted. Moreover, we think the subsequent correspondence, when considered in other aspects, makes certain the conclusion that the words "F. O. B. Manila," as used in the proposal, meant precisely what we have stated the context of the proposal indicated that those words were intended to imply. This we think results from the provisions of the letter of August 28, selecting a particular firm to whom the goods were to be delivered for transport to Manila, and of all the other directions contained in the letter, since they are inconsistent with the theory that the words "F. O. B. Manila" were used as meaning that the goods should not be delivered as directed, but should remain the property of Andrews & Co., and be under their control and subject to their risk until delivered at Manila. Especially is it impossible to attribute to the words "F. O. B. Manila," used in the original proposal and reiterated in the letter of August 28, any other meaning than that which we have affixed to them, when the note which was expressly referred to in the letter of August 28, and which was inclosed therein, is considered. By the terms of that note not only were the previous specific directions as to the mode of shipment confirmed, but it was expressly provided that the delivery to the agent selected by the Division of Insular Affairs should be "F. O. B. Jersey City," thus making clear the distinction between the sense in which the words "F. O. B. Manila" were used in the proposal and their meaning applied to the final delivery at Jersey City in consummation of the contract by which the sum of the freight to Manila had been in-

cluded in the purchase price. So also the same implications arise from the final instruction, shifting the place of delivery from Jersey City and directing that the merchandise should be delivered to the agent selected, "F. O. B. Brooklyn." We think the contention made in argument, that the letter of August 28 and the acceptance by Andrews & Co. of the terms of that letter, should be alone held to constitute the contract, disregarding the note inclosed in the letter as a part thereof, is refuted by its mere statement. In any event, taking the most favorable view possible for the Government of the contract, we think it cannot be said that the presumption which arises from the delivery of the goods to the carrier designated by the Government and the acceptance by the Government of the bills of lading made to the consignee or his order, is rebutted by the contract.

Lastly, it is urged that in any event the court below erred, since the contract in question was not "reduced to writing and signed by the contracting parties with their names at the end thereof," as required by Rev. Stats., § 3744. But it is settled that the invalidity of a contract because of a noncompliance with the section referred to is immaterial after the contract has been performed. *St. Louis Hay &c. Co.* v. *United States,* 191 U. S. 159, 163. The contention that the contract in question had not been executed because there had been no delivery, is disposed of by what we have already said.

As the views which we have expressed concerning the delivery dispose also of many subsidiary contentions based upon isolated provisions of the contract, such as the right to verify the contents of the package at Manila, etc., it follows that the judgment below was right, and it is therefore

*Affirmed.*