## G. I. Frazier Company v. Owensboro Stave & Barrel Company.

(Decided January 22, 1915.)

### Appeal from Daviess Circuit Court.

1. Contracts—Sale of Personal Property—Intention of Parties.—In a contract for the sale of personal property, the intention of the parties controls, as to whether the title passes or does not pass, regardless of all other circumstances of the transaction.
2. Contracts—Sale of Personal Property—Title.—Before the title to personal property passes from the vendor to the vendee, the price must be agreed upon, or some method agreed upon by which the total price can be definitely ascertained.
3. Contracts—Sale of Personal Property—Inspection.—Where property, such as staves, is shipped by a common carrier from a distant point to a purchaser, and he has had no opportunity for inspection, he has a right to inspect the property before receiving it, to determine whether it is in accordance with the contract or not, and if not in accordance with the contract, to reject it, unless it appears from the contract that it was intended for the title to it to pass to the purchaser without inspection.
4. Contracts—Intention of Parties—How Determined.—In determining what was the intention of the parties in a contract for the sale of personal property, the court should look to all of the facts and circumstances, and the customs of the trade in such commodity.

C. W. WELLS, W. F. HAYS and JORDAN STOKES, JR., for appellant.

SHEILD, CAMPBELL & McATEE and LE VEGA CLEMENTS for appellee.

Opinion of the Court by Judge Hurt—Affirming.

The G. I. Frazier Company was the appellant, doing business as a stave dealer, with office in Nashville, Tennessee. Hiram Blow and Company was a partnership, which was engaged in dealing in barrel staves, with offices in Nashville, Tennessee, in the same building in which G. I. Frazier had his office. V. J. Blow had control of the active management of the affairs of Hiram Blow & Company, and H. B. Carter was also a general manager for Hiram Blow & Company. The Owensboro Stave & Barrel Company was a corporation, engaged in the business of a cooper at Owensboro, Kentucky.

V. J. Blow was the president of the Owensboro Stave & Barrel Company, and had control of the management of its affairs as its general manager until about the first of July, 1910, when the directors at a meeting removed him from the management and invested R. S. Dinwiddie with the business of general manager of the affairs of the corporation. Some time previous to the shipping of the staves in controversy, V. J. Blow, acting for Hiram Blow & Company, and R. S. Dinwiddie, acting for the Owensboro Stave & Barrel Company, which hereafter we will call the appellee, made an arrangement whereby it was agreed that Hiram Blow & Company would furnish all of the staves, similar to the ones in controversy, at $1.50 per set (a set being a sufficiency of staves to make a barrel which was 81 inches in circumference), which were needed by the appellee, over and above what it could buy from other sources. Toward the latter part of July, 1911, Hiram Blow & Company gave G. I. Frazier Company, whom we will hereafter call the appellant, an order to ship to the appellee the two carloads of staves in controversy, at Owensboro, Kentucky, which appellant did, consigning them to himself. The appellant bought the staves from the Brown Stave Company, at Monroe, Louisiana. When appellant received the bills of lading he endorsed them "in blank" and delivered the bills to Hiram Blow & Company, and at the same time charged the staves to Hiram Blow & Company upon his books. Hiram Blow & Company then delivered the bills to the appellee, and at the same time sent it an invoice, in which the price of the staves was stated as being $1.75 per set. At the same time Hiram Blow & Company charged the staves to appellee upon its books, and credited appellant with them. The staves arrived at

the railroad station at Owensboro about the last of July or the first of August, 1911. The negotiations between Hiram Blow & Company and appellee were thence forward conducted through the medium of letters dispatched by the mails. On August 3rd Hiram Blow & Company wrote to appellee in substance acknowledging receipt of appellee's communication in regard to the staves, and asking it to "get a report from Joe on this, as Mr. Frazier is exceedingly anxious to have it and there is no reason why Joe can't make some kind of a report and we can settle with Frazier and fight the matter of price out between you." What the communication was that the above letter was in response to does not appear.

On August 7th appellee wrote to Hiram Blow & Company that Joe had shown Dinwiddie the bills of the staves, and "it could not pay more than $1.50 per set for them. Please advise if the above is satisfactory before we unload them." It appears that between this date and August 14th that Hiram Blow & Company had written appellee and requested it to send them "some acceptances." This letter does not appear in the evidence.

On the 14th day of August appellee wrote Blow & Company, saying: "Enclosed please find our acceptances on the three last cars shipped us. You will note we have not inspected these cars or gotten the freight amounts to deduct, which will be charged to your account." There were two of the acceptances, one for the sum of $1,159.50, which was endorsed that it was in payment of staves in car No. 24128, I. C., and the other acceptance was for the sum of $1,140.00, and endorsed that it was for the payment of staves in car No. 25797 V. S. & P. These were the cars containing the staves in controversy. These acceptances were drawn in favor of Blow & Company, and promised the payment of the amounts respectively, the one thirty days after date, and the other forty-five days after date. Blow & Company accepted said "acceptances" and at once negotiated them, and thereafter they were paid by appellee, the one on September 14th and the other on September 29th. Instead of Blow & Company entering the acceptances as payment for said two cars of staves, as directed by appellee, it credited them upon appellee's general account. Upon the same day, August 14th, upon which appellee mailed the acceptances to Blow & Company, Blow &

Company wrote to appellee saying, in substance, that appellee's communication of the 3rd "would have had more prompt attention, but Carter has been away from Nashville, but on the staves I should like to have a full and complete report of just what the staves are that you have received, and I am quite positive that the price at which they are billed is not at all unreasonable, and that it would be a good idea for you to have some of them K. D. & S. staves on hand." Further: "I had Mr. McQuay write you a day or two ago asking you to send us some acceptances, which I trust you will do, and, if it is convenient for you to pay part cash, it will be quite acceptable to us. We will have no trouble in settling all matters, when we can get together for this purpose."

On the same day H. B. Carter, general manager of Hiram Blow & Company, reported to appellant that the staves shipped to Owensboro were not satisfactory to appellee, when appellant said to him, "Mr. Carter, see what they will allow you for the staves, and if we can, let us adjust it." On the same day Blow & Company wrote appellant in substance that the staves at Owensboro had been rejected, and that they desired to turn the staves over to appellant "so you may arrange a settlement on same." Further: "I am sorry that you have had this trouble on these shipments, but before we would want to take any further responsibility in regard to the staves you would have to make proper settlement with the Owensboro Stave & Barrel Company, and, therefore, we think it best to reject these staves." On the 15th day of August Blow & Company wrote appellee acknowledging receipt of its letter of the 14th, and saying that they desired a statement and report on the staves, and that they were crediting the acceptances on account and not against any particular car, and to get the report requested as quickly as possible, as they had rejected the staves to the party shipping, and do not consider the staves "our property until we come to some further adjustment." Further: "I am going to be in Louisville on Saturday, and I am anxious to see you in reference to the Owensboro situation, and, in fact, a number of matters." On August 21st appellee wrote to Blow & Company, in substance, saying that the first time Dinwiddie is in Owensboro that he will attend to the taking of the staves, and enclosed freight receipts paid for the staves, in the sum of $200.00, and says:

"This and the acceptance you got is a right smart to be out on a lot of rejected stuff." It further added: "There was no use of getting into this, and if you had left these staves alone I could have bought them a great deal cheaper."

On August 24th appellees wrote Blow & Company that their letter of the 23rd relative to the staves, had been received, and that its foreman promised to get up a report on the staves upon that evening, and send it to them; that Dinwiddie would be away for a week, but when he returned that he would also inspect the staves.

On August 26th Blow & Company, in response to above letter, wrote appellee that they hoped to get report on the staves as soon as possible. On the 9th day of September appellee wrote Blow & Company saying that it enclosed a percentage of the staves; that Dinwiddie had gone through 500 in each car, but that the bundles had come apart and were in such shape they could not be counted; that directions had been given to count them when they had been straightened up, and further wrote: "If you want us to use them on this inspection, please advise. Of course, the count will all be credited to you when you get it."

On September 11th Blow & Company wrote appellee saying that they had received the inspection of the staves sent them on the 9th and that they noted that one car contained 91% prime staves and the other 85 1/3 prime staves; that what they wanted now to know is, how much allowance appellee wanted them to make for the staves which are not prime, and saying that they expected appellee to pay for the prime staves, the invoice price, and requested an answer by return mail as to "what allowance you want us to make for the stock which is not prime."

On September 13th appellee wrote Blow & Company that for the staves which would have to be re-jointed it would pay the price of the rejointed staves, less the expense of rejointing and what is cut away to make a smoother joint, which would be $5.00 per thousand, and would pay for the oil staves $30.00 per thousand, and, as to the prime staves, it would not pay the price at which they were billed; and further saying: "We have your agreement to adjust the price, if we would send the acceptances, which we did, and we expect you to stand up to this agreement. Now, if it is not

satisfactory with you for us to work these staves, please advise promptly, so we can let you take up the acceptances yourselves, you pay us the expense we have been out on them." On September 19th Blow & Company wrote appellee saying that they think the allowance asked for rejointing is rather heavy and that the price for the oil staves a little low, but if it could reduce the price for rejointing and make a little better price on the oils, "we can arrange a better settlement."

On September 21st appellee wrote Blow & Company saying to "please advise what price you should have for the oils, also what you think would be right for the jointing, and what would be cut away on the rough joint on these staves that are to be rejointed. As that is all there is between us, we can surely get together on that."

On September 29th appellee sent a complete report of the count and inspection of the staves, "which we had recounted at Owensboro. We are charging your account with the difference made by the grades."

This report shows that there were 1,532 sets of the staves, which, at the price allowed in the report, showed that the two acceptances over paid the amount which the staves were worth by the sum of $155.93. The price of the prime staves being $1.50 per set, and the oil staves and those necessary to be rejointed in both cars being valued altogether at $117.04.

On October 7th Blow & Company wrote appellee saying that the settlement made of the stave matter as contained in appellee's letter of the 29th of September, is unsatisfactory, and that appellee, having some time ago rejected the staves, advised appellee under no circumstances to use any of them until the matter is adjusted; that they had rejected the staves from the party making the shipment and that he was unwilling to make the settlement suggested, "nor are we in turn willing to accept anything like $1.50 per set for the staves delivered at Owensboro; therefore, we caution you not to use any of this stock, because it does not belong to us nor to you until the matter is definitely settled."

This communication was the last heard from Blow & Company in the negotiations, and either upon the 11th or 13th of October, thereafter, Blow & Company was adjudged a bankrupt, and on the 12th day of October the appellant set up his claim to the staves. He sent

several communications to the appellee, but we do not deem a reference to them necessary to a proper determination of this case.

The possession of the staves having been delivered to appellee by the delivery of the bills of lading to it, it thereafter took manual possession of them and used them, or the greater portion of them, in its business before the bringing of this suit.

On the 26th day of June, 1913, nearly two years after the transaction in regard to the staves, the appellant filed his petition in ordinary, alleging that he was the owner of the staves and that they were worth in the market $1.63 per set, and that on the —— day of September, 1911, the appellee had wrongfully converted them to its own use, and prayed a judgment in the sum of $2,498.79 in damages against appellee.

The appellee, by its answer, traversed the ownership of the staves by appellant at the time of their conversion, and denied that they were worth more than $1.50 per set, and affirmatively pleaded that it purchased the staves from Hiram Blow & Company under a contract, by which it was to pay Blow & Company $1.50 per set for them, and that Blow & Company delivered the staves to it, and it had paid the contract price to Blow & Company for them as Blow & Company had requested. The appellant, by reply, denied the affirmative allegations in the answer and alleged that if appellee paid anything to Blow & Company that it was in satisfaction of an indebtedness other than for the staves, and that said payments were not accepted by Blow & Company in payment for the staves, and that he shipped the staves to Owensboro upon the request of Blow & Company, who had ordered them for appellee, and that appellee rejected the staves and would not receive or pay for them, of which Blow & Company notified appellant, and Blow & Company also rejected the staves, and that appellants acquiesced in said rejections, and continued to be the owner of the staves when they were converted, as alleged by the appellee.

The appellee, by rejoinder, traversed the allegations of the reply. The issues being thus joined, the case was tried by the court without the intervention of a jury. The court being of the opinion that the appellant has failed to manifest his right to a recovery, adjudged that his petition be dismissed, and in response to appellant's

demand that the court state in writing its finding of facts separate from its conclusions of law, filed a written opinion, embodying its separate findings of facts and conclusions of law, to which appellant excepted, and excepted to each separate finding of facts and conclusions of law, and then produced and filed a written motion and grounds for a new trial, and moved the court to set aside the judgment and to grant him a new trial, which the court overruled, to which appellant excepted, and now appeals to this court.

The grounds upon which appellant asks a reversal of the judgment below are: First, that the decision of the court and judgment are not sustained by sufficient evidence, and are contrary to the evidence and contrary to law. Second, that the court erred to his prejudice in admitting incompetent evidence offered by appellee, and in refusing competent evidence offered by appellant, and to which rulings of the court he excepted at the time. Third, because the court, although requested, failed to state separately its conclusions of law from its finding of facts, and because to the extent the opinion filed by the court did separate the conclusions of law and finding of facts, that said conclusions and findings were not supported by the evidence and were contrary to law.

The facts above stated in this case have been set out with particularity, because of the difficulty experienced in applying the well-settled rules of the law to the facts of this transaction.

It is an elementary principle of the law held everywhere that, in negotiations for the sale of personal property, that the title to the property passes to the seller from the buyer (when no other persons are concerned but the parties to the transaction), or does not pass according to the intent of the parties, and this intent will always control in the determination of whether or not the title to the property passes from the seller to the buyer, regardless of the other circumstances of the transaction. The difficulty in determining whether or not a sale of personal property has been made arises from the difficulty, if it exists, of determining what the intent of the parties was. The courts have from time to time, when the circumstances would otherwise leave the mind in doubt as to what the intent of the parties was, adopted rules applying to a certain state of facts

to assist in determining what was the intent of the parties to the transaction. One of these rules is, that where, under a contract for sale of personal property, it is delivered to the buyer, the presumption is usually indulged that the title has passed, unless a contrary intention is apparent from the agreement or circumstances, but if the parties agree thereto, the title may pass without a delivery. Hagins, &c. v. Combs, etc., 102 Ky., 165.)

Another of these rules is, that where the property is in a condition to be delivered, but the property has to be weighed, measured, tested, or some act has to be done by the seller for the purpose of ascertaining the price, the title does not pass to the purchaser until such thing or things are done, but, where nothing of this kind remains to be done, and the parties intend it, the title passes immediately, though it yet has to be weighed, measured or tested to ascertain the total price. (Newcomb, Buchanan & Co. v. Cabell, etc., 10 Bush, 460.)

In the case of Thompson v. Brannin, Brand & Glover (94 Ky., 490) this court said: "But whether a sale vests the right of property in the vendee presently, or not until the thing has been done by the vendor for ascertaining the weight, extent or price of such property, must, of course, depend upon the intention of the parties manifested by the character of the contract or circumstances under which it was made, and the question may be sometimes determined by the custom of the trade in respect to a particular commodity."

Where the seller, in accordance with the terms of the contract, delivers the goods to a common carrier for the purpose of having them transmitted to the buyer, it is presumed that the title to them passes to the buyer, unless the seller expressly reserves the right to dispose of them. The acceptance of payment or part payment from the buyer of the price of the goods delivered to the buyer is a strong presumption of the intention to pass the title and the payment on the part of the buyer is a strong presumption of the intention on his part to acquire title.

If one has the contract for the purchase of goods and receives and appropriates them to the contract, it is presumed that the title passes to the buyer, without the payment of the price. The weight of authority, however, requires that, before a sale of personal property

becomes complete, and the title passes, there must either be an agreement as to the price or an agreement by the terms of which the price can be certainly ascertained after the sale.

In the case of Hagin v. Combs, etc., *supra,* the contract was that the vendee should pay the vendor such a sum for the logs sold as would equal the most that any one would give the vendor for the logs at a certain named place, and the court held that was a sufficient agreement as to price to pass the title to the logs. Hay sold at so much per hundredweight, to remain in the possession of the vendor until it shall be weighed by the vendee, this court held, in Burk v. Shannon (11 R., 1171) to be a sufficient agreement as to price to pass the title.

If the seller has done all required of him by the contract, and the counting, weighing, testing, etc., to ascertain the whole price must be done by the vendee, the title passes, unless a contrary intention is apparent from the agreement and circumstances. It is not material as to whether or not the vendor is the owner of the property; if he is in position to deliver the goods and pass a perfect title, the title passes to the vendee when the parties so intend. (Bell v. Offutt, 10 Bush, 632.)

Another rule relative to sales is: "The intention of the parties must be gathered from the language or conduct of both, and the legal effect of what they say and do cannot be altered or modified by the undisclosed intention or secret understanding of either." (Bell v. Offutt, *supra.*)

There can be no doubt but what in a case like the one at bar, where the goods were shipped to the buyer from a distant point, and he had had no opportunity to inspect them, he would have a right to take them into possession by virtue of the bill of lading, for the purpose of making an inspection to determine whether or not they were in accordance with the contract of sale, and if the staves did not comply with the contract, to reject them, and, in this state of case, the delivery would not pass the title, unless the intention of the parties was that the title should pass without an inspection. It seems from the evidence in this case that it had been a custom of the stave dealing between Blow & Company and appellee that when staves were shipped to appellee by Blow & Company, and were accepted at a certain price, and the title passed to appellee, the appellee

still had a right to make a grading of the staves, and to make a claim against Blow & Company for a reduction of the total price on account of cull staves, and such as did not comply with the contract, and these inferior staves seem to have been sold to appellee at the market price for such character of staves. If the staves in controversy had been invoiced to appellee at $1.50 per set, and the bill of lading delivered to it as it was, and appellee took them into possession as it did, and then paid for them, as it insisted that it did do, there could be no controversy as to whether or not the sale was made, but it seems that Blow & Company, although they charged appellee with the staves upon their books, and delivered the possession of them to appellee, by turning over to it the bill of lading, thereby evincing their intention to sell them to appellee, and to pass the title to them, the invoice price charged for them was $1.75 per set, instead of $1.50 per set, as per contract with appellee. Appellee exercised its right of inspection, and, on the 7th day of August, notified Blow & Company that it had seen the bills of lading and could not pay more than $1.50 per set for them, and asked to be advised if that price was satisfactory before the staves were unloaded. This was a rejection of the staves at the price offered. On the 3rd of August Blow & Company had written appellee a letter which conclusively indicates that the invoice price was only tentative. From Blow & Company's letter to appellee, on the 14th day of August, it appears that some time between that date and the 7th that Blow & Company had written appellee regarding payment for the staves. Blow & Company must then have had appellee's letter before them in effect offering them $1.50 per set for the staves. With this proposition of appellee before them, their request for the payment for the staves, or, in the language of the letter, to send them "some acceptances," it must be presumed that Blow & Company accepted said counter proposition, and appellee, on the 14th day of August, sent to Blow & Company "acceptances" covering the price of all of the staves at the price of $1.50 per set. This was a meeting of the minds of the parties, so far as the price was concerned, and all the other essentials necessary to a sale of the staves had already been effected. The offer to sell had been made; the delivery had been made by the transfer and delivery of the bills of lading to appellee;

a sufficient inspection to satisfy appellee had either been made or waived; the price had been fixed and accepted; and payment in accordance with the price, and as directed by Blow & Company, who accepted the "acceptances," negotiated them, and appropriated the proceeds. It is true that, on the 14th day of August, the same day upon which appellee sent the "acceptances" to Blow & Company by mail, Blow & Company wrote appellant, notifying him that the staves had been rejected by appellee, and that Blow & Company also rejected the sale of the staves to them by appellant. It does not, however, appear that appellant, at that time, acquiesced in or agreed to rescind the sale of the staves that he had made to Blow & Company, and then, if ever he did so, does not appear, and he does no act indicating that he acquiesced in the rejection, except that at some time or other he credited Blow & Company by the staves upon his books. There is no doubt but what Blow & Company had authority to sell the staves at the time they accepted the counter proposition of appellee, by writing for the "acceptances," and at the time the "acceptances" were mailed to them. There is no dispute as to whether or not appellant had sold the staves to Blow & Company. He says that he had done so, and the general manager of Blow & Company says the same. Appellant had charged Blow & Company with them upon his books, and delivered them to Blow & Company by transferring the bills of lading to them. As to what the terms of the contract between them were we do not know. Appellant says that he knew at the time he sold the staves to Blow & Company that they were to be sold to appellee. When Blow & Company notified appellant that the staves had been rejected by appellee, this was on the 14th day of August, but, as before said, he does not appear to have accepted the rejection to him by Blow & Company, but, instead, instructed Blow & Company to ascertain what appellee would give for the staves, and to try to effect a settlement with it, if they could. He failed to notify appellee of his claim to ownership of the staves until either the day before or day after Blow & Company went into bankruptcy. He shows that he knew of the negotiations between appellee and Blow & Company, and knew of appellee's giving the "acceptances," and Blow & Company's receipt and appropriation of them. He knew of appellee's letter to

Blow & Company, on September 13th, when it notified Blow & Company if the settlement for the staves offered was not satisfactory, to notify it, so that it could let Blow & Company take care of the "acceptances" themselves, which Blow & Company did not do, and allowed appellee to pay the "acceptances," amounting to over $2,200. He also knew that appellee was in ignorance of the negotiations between himself and Blow & Company. He had put the staves into Blow & Company's possession. Upon familiar principles, appellant is estopped to deny that Blow & Company had authority to sell the staves until he should withdraw his instructions to Blow & Company to settle the matter with appellee, and notify appellee of his claims.

It is insisted that Blow & Company did not accept the "acceptances" from appellee in payment for the staves, but credited them upon the general account of appellee with Blow & Company. By a very familiar law, Blow & Company had no right and could not accept said "acceptances" in payment for anything else except the staves. The "acceptances" had statements on them, designating the two cars of staves in controversy as being the ones for which the "acceptances" were given in payment, and appellee directed Blow & Company by letter to place them as a credit upon the price of these staves.

While there was some controversy between Blow & Company and appellee in regard to the state of their accounts, it appears that appellee, at the time the "acceptances" were given and accepted by Blow & Company did not owe them for anything except these staves and a carload of heading, and Blow & Company had nothing else, except this, to receive the "acceptances" in payment of. The correspondence between Blow & Company and appellee after August 14th seems to relate to a settlement between them on account of the claim against Blow & Company by appellee, on account of the inferior staves in the cars in controversy. Appellee never consented at any time that the "acceptances" should be applied to any other indebtedness than for the staves, although, on September 13th, appellee, by letter, substantially made the offer to Blow & Company to give up the staves if Blow & Company would pay the "acceptances" given in payment for the staves, which Blow & Company did not do. Appellant did not under-

take to claim the staves until Blow & Company was toppling into bankruptcy, and then waited from October 12th, 1911, until June 26th, 1913, to assert his claim by a suit.

As to the understandings which existed between Blow & Company and appellant, which were withheld from appellee, they do not affect the rights of the appellee in the matter, as their words and actions must be construed according to their legal effect, and must not be altered or modified by the undisclosed intention of either. (See Bell v. Offutt, *supra*.)

Being of the opinion, from all of the facts and circumstances in evidence, that the lower court did not err in its opinion, so far as denying the appellant the relief sought, the judgment appealed from is affirmed.