**TROY REFINING CORPORATION v.
SLAGTER OIL & GREASE CO.**

**No. 99.**

District Court, W. D. Kentucky, Owensboro.
July 21, 1945.

R. Miller Holland, of Owensboro, Ky.,
for plaintiff.

Edward B. Hayes and Lord, Bissel &
Kadyk, all of Chicago, Ill., and Wilbur K.
Miller and Cary, Miller & Kirk, all of
Owensboro, Ky., for defendant.

SWINFORD, District Judge.

This is an action to recover the purchase
price of a quantity of heavy fuel oil which
the plaintiff alleges it sold and delivered
to the defendant.

By an oral contract the plaintiff sold to
the defendant a quantity of heavy fuel oil
to be delivered to the defendant at the
plaintiff's dock, by being loaded into a barge
spotted at the plaintiff's dock by the de-
fendant, or a common carrier employed by
the defendant. The plaintiff's dock was on
the Indiana side of the Ohio River at the
mouth of Anderson Creek. On April 28,
1942, the barge in question, which is iden-
tified in the record as A.B.L. No. 23, was
spotted at the plaintiff's dock by the Amer-
ican Barge Line Company, a common car-
rier employed by the defendant to receive
the oil from the plaintiff's tanks. The oil

was to be carried in this barge to a destination fixed by the defendant and was sold for delivery to the barge and f.o.b the plaintiff's dock.

Before loading the barge the plaintiff notified the defendant that the barge was spotted at the dock. The defendant sent its agent, John Benton, who went upon the barge and took a gauge of the various tanks to determine what oil, if any, they contained. This inspection was made on the afternoon of April 28th. Mr. Benton then returned to his office some 65 miles away at Spotsville, with instructions that he should be notified when the barge was filled to within 8 or 10 inches of the top. Shortly thereafter the loading began and the oil was run into the barge through a 4-inch pipe extending from the plaintiff's shore tanks, which were a distance of approximately 2000 feet from the dock. Oil ran into the barge all night and when the barge was within about 18 inches of being filled, it stranded or grounded on its forward port corner. The loading was immediately stopped and by means of a winch truck, the barge was pulled or winched off of the ground and again floated free. No more oil was loaded into the barge.

The next step in the chronology of events is disputed and the plaintiff's proof is to the effect that after the barge was winched off the ground, and shortly before noon, it called the defendant and advised it that the barge was ready to be topped out. The defendant denies that it ever received this call. According to the proof, however, which is not contradicted, shortly after noon, the barge began to list to the stern and the plaintiff called the United States Engineers' office and advised them of this fact and asked what, if anything, could be done to prevent a possible sinking of the barge. It is not clear just what the advice was but nothing was done and the barge sank on the afternoon of the 29th, at sometime after 2:30 o'clock. No second gauge or inspection was ever made by the defendant.

The record presents two questions. The first question is whether or not there was a delivery of the oil. The second question is, if there had been a delivery within the meaning of the law, was the sinking of the barge caused by the negligence of the plaintiff? I will discuss these questions in the inverse order of their statement.

The barge was under the control of the defendant, or its carrier, the American Barge Line Company, at all times. The plaintiff owed no duty other than to use ordinary care in loading the barge and handling it while it was receiving the oil.

The only bit of proof on this question is that the barge was only slightly grounded, that it was not caused to list while it was thus grounded, but remained at an even keel. Whatever may be the real facts as to whether the grounding caused a listing of the barge, the court has nothing before it from which to reach a conclusion other than the evidence of the witnesses, and they all agree that while this barge was grounded it maintained an even keel. While it may be well reasoned that the grounding at the forward port side of the barge, with the continued loading of the barge, caused the stern to list to such an extent that it received water in the vents and openings, I do not believe that the proof would justify the court in reaching this inference. As a matter of fact, there is positive proof that this barge did not begin to list for some two or three hours after it was winched off the ground. When it was observed that the barge was grounded, three or four men endeavored to push it off the ground by means of hand tools but were unable to do so. A winch truck was taken to the opposite side of Anderson's Creek and, with a cable or manilla rope attached to a stanchion on the deck of the barge, the barge was ungrounded with what is represented as a single and slight pull by the winch truck. It then floated free at an even keel and remained at an even keel, as I have heretofore said according to the only proof on the question, for two or three hours, or until shortly after noon.

▉▉▉ I cannot speculate on what caused the barge to sink and presume the negligence of the plaintiff. Negligence must be proved. Kentucky Glycerine Co. v. Woodruff Development Co., 233 Ky. 325, 25 S.W. 2d 736. While negligence can be inferred from facts proven, the facts on which the inference or presumption rests must be proved. Stull's Adm'x v. Kentucky Traction & Terminal Co., 172 Ky. 650, 189 S.W. 721. The defendant here seems to take the position that the plaintiff must prove that it was not negligent. I do not have before me Shearman & Redfield on Negligence, 6th Ed., Section 58(b), in which a quotation

from Scott v. London, etc. Dock Co., 159 Eng.Repr. 665, as given in defendant's brief, is quoted, but from the authorities cited in the brief which I do have available I cannot find any reason to place this burden of proof of no negligence upon the plaintiff.

Consequently I must necessarily conclude from this evidence and from any reasonable inference which may be drawn from the evidence, that the sinking of the barge was not caused through any negligence on the part of the plaintiff. That the only thing that was done was the ungrounding of the barge, which seemed to be a relatively minor undertaking, which was successfully carried out by conventional methods. There is no showing that the plaintiff at any time while the barge was being loaded failed to exercise ordinary care to prevent damage.

The next question in this case, and the one first above stated, is whether or not there was a delivery of the oil to the defendant within the meaning of the law.

One circumstance to be considered in the determination of this question is the fact that this oil was a by-product of the refinery and the plaintiff had been selling all of this by-product to or through the defendant for eight months prior to the happening involved here. Seven or eight barge loads of oil had been delivered to the defendant in this same way and under the same circumstances. It is not clear and I cannot ascertain from the record the amount of oil that was contained in these other barges. That is, whether or not they were filled to capacity at the time they left the plaintiff's dock on the previous occasions. The plaintiff states that it had an arrangement or tentative understanding with the defendant to receive all of its heavy fuel oil. The defendant contends that it purchased a barge load of oil and that since a barge load of oil had not been delivered, there was no delivery of oil at the time of the loss; that no title passed and it was under no obligation to pay for the oil until the barge had been filled to within 8 or 10 inches of the top and an opportunity for inspection had been given. There is a general statement of the issue involved here contained in 46 American Jurisprudence p. 605, § 440, which I quote: "The question as to when the title passes in case of a delivery to a carrier for transportation to the buyer primarily depends on whether such delivery is a full compliance with the duty of the seller with respect to delivery, and on the intention of the parties as to whether the title shall pass at the time of such delivery or not. It is the general rule, where the goods sold are to be shipped by carrier and the place of delivery is the point of shipment, that a delivery of the goods to a carrier, consigned and properly directed to the buyer, whether the carrier is one designated by the buyer or by the seller with the consent of the buyer, passes the title to the buyer if there is nothing else to show a contrary intention. In such case, the time and place of delivery are regarded as the time and place of sale, the carrier is deemed the bailee of the buyer for the purpose of transportation, and the seller is deemed the agent of the buyer in employing the carrier."

The defendant has filed herein a very excellent and exhaustive brief. Most of the cases cited in the brief, however, are from state courts of last resort or English authorities which I do not have available. I believe, however, that the quotations from these authorities are not at variance with the general understanding of the rule on the question of the passing of title and it only remains to determine whether or not the facts in this case bring it within the rule that title passes to the buyer upon delivery of the goods unless there is something expressly to the contrary in the contract or arrangement between the parties.

Here 90 percent of the oil had been delivered and the barge was practically filled. According to the plaintiff's theory the defendant had been notified and had had ample time to make any further inspection which it might desire and it had not concluded topping out the barge, since it was awaiting inspection by the defendant. It is true that the barge had not been filled to within "8 or 10 inches" of the top but it had been filled to within about 15 or 18 inches of the top. All of this is an approximation and it would be straining a point to say that this barge had not been filled to approximately the amount directed by the agent of the defendant and was ready for inspection and to be topped out. There can be no question but that the oil was the product and of the quality ordered by the buyer. According to the testimony it was a well identified by-product which the plaintiff had been selling to the defendant for the past several months and there is nothing to indicate that either party expected or required an inspection as to qual-

ity. Had there been no loss there would undoubtedly have been a delivery as on previous occasions without any thought of looking into the quality or inspecting the quality of the product.

 John Benton, the agent of the defendant, had been at the plaintiff's plant within a few hundred feet of its tanks, from which the oil was to be taken and did not request that he examine it or question its quality, but directed that the barge was ready to receive the oil. It must be assumed that it was well understood between the parties that this was a product similar in kind and quality to that which the defendant had been buying from the plaintiff for past several months.

Considering the question of delivery, I think the Kentucky statutory provision should govern. Kentucky has adopted the uniform sales act. Section 361.460, subsection 1, of the Kentucky Revised Statutes provides that delivery of the goods to a carrier for the purpose of transmission to the buyer is a delivery. Also, subsection (4) (b), of § 361.190, K.R.S., states that a delivery to a carrier for the purpose of transmission is an unconditional presumption that the seller has delivered the goods to the buyer and it is expressly provided that this presumption is applicable, although by the terms of the contract, the buyer is to pay the price before receiving delivery of the goods and the goods marked with the words "collect on delivery" or their equivalent. We see from this statutory enactment that it is the whole purpose of the law of sales, and the uniform sales act, to definitely fix a time for the passage of title to goods and to avoid uncertainty and speculation in so far as it is possible. I cannot but conclude here that there was a substantial compliance with the contract when these goods were delivered into the barge and the barge was approximately full and the difference between the amount to which it was to be filled, as directed by the buyer, and the amount to which it was filled, as shown by the proof, was at most five or six inches.

The case of Nelson Bros. Coal Co. v. Perryman-Burns Coal Co., Inc., 2 Cir., 48 F.2d 99, 100, seems to be a case in point. In the opinion the court said:

"In general, where a sale is made f. o. b. the point of shipment, title passes to the seller upon delivery to the carrier, and the goods sold are at the buyer's risk. United States v. R. P. Andrews & Co., 207 U.S. 229, 28 S.Ct. 100, 52 L.Ed. 185; Standard Casing Co. v. California Casing Co., 233 N.Y. 413, 135 N.E. 834; Rosenberg Bros. & Co. v. [F. S.] Buffum Co., 234 N.Y. 338, 137 N.E. 609. This rule would seem to apply with special strength where the coal was loaded into a barge belonging to the purchaser. In the present case the buyer was to pay both freight and insurance as well as trimming and other expenses at Undercliff. A right to inspect and reject the coal if it did not meet contract requirements would not prevent the passage of title.

"In Louisville & Nashville R. R. v. United States, 267 U.S. 395, 45 S.Ct. 233, 236, 69 L.Ed. 678, where the United States reserved the right to test coal after transportation and reject it if it did not come up to specification, it was held that such a right 'was not inconsistent with transfer of title * * * at the time of delivery of the coal on cars at the mine.' Delaware, Lackawanna & Western R. R. v. United States, 231 U.S. 363, 34 S.Ct. 65, 58 L.Ed. 269; Illinois Cent. R. Co. v. United States, 265 U.S. 209, 44 S.Ct. 485, 68 L.Ed. 983."

A much quoted case on this question is United States v. F. R. P. Andrews & Co., 207 U.S. 229, 28 S.Ct. 100, 104, 52 L.Ed. 185. The fundamental rule taken from the opinion is: "That, as a general rule, the delivery of goods by a consignor to a common carrier, for account of a consignee, has effect as delivery to such consignee, is elementary. That where a purchaser of goods directs their delivery for his account to a designated carrier, the latter becomes the agent of the purchaser, and delivery to such carrier is a legal delivery to the purchaser, is also beyond question. Certain also is it that when, on the delivery of goods to a carrier, bills of lading are issued for the delivery of the goods to the consignee or his order, the acceptance by the consignee of such bills of lading constitutes a delivery." See to same effect in Kentucky, Woodbine Children's Clothing Co. v. S. Goldnamer & Son, 134 Ky. 538, 121 S.W. 444, 20 Ann.Cas. 1026; Fisher v. Commonwealth 147 Ky. 821, 145 S.W. 737, 44 L.R.A.,N.S., 435.

It is strongly urged by the defendant that no delivery was completed because the quantity of oil that had been ordered by the defendant was a barge-load of oil and since the barge was not filled at the time it was sunk, the agreement to deliver a barge-load of oil had not been fulfilled. Thus it is rea-

soned that since something remained to be done by the seller, the buyer was not bound to accept less than a barge-load and no delivery was completed.

In considering this phase of the case, the court takes into consideration the prior custom of dealing between the parties in relation to this oil. It appears that there was a definite understanding which had been in effect for several months, that the defendant was to take all the oil of this type off the plaintiff's hands at an agreed price. This was not a separate and distinct contract but was rather a continuation of dealings had between the parties in relation to all of the plaintiff's heavy fuel oil. In other words, the understanding between the parties was not so much that there should be delivered a barge-load of oil at this particular time as that the defendant was to take whatever amount of oil the plaintiff had on hand. This previous course of dealing between the parties, which in reality relates back to an understanding of several months prior to the 29th of April, is one element strongly pointing to the intention of the parties.

G. I. Frazier v. Owensboro Stave & Barrel Co., 162 Ky. 301, 172 S.W. 652.

I must conclude that this was not so much the sale of a unit of oil (that quantity identified as a barge-load), but was a delivery of a part of the whole quantity of oil produced by the plaintiff, which it had agreed to deliver to the defendant whenever this oil, (a by-product), accumulated in sufficient quantity to approximate a barge-load, which might be either a little more or a little less than a full barge-load.

█ Prior to the adoption of the uniform sales act, the Kentucky courts had adhered to the rule that title passed at the time the contract of sale was entered into, regardless of payment of purchase price or delivery, and it held in a number of cases that the property and risk of accident vested in the buyer as soon as the bargain was struck. Thompson v. Brannin &c., 94 Ky. 490, 21 S.W. 1057; Newcomb, Buchanan & Co. v. Cabell, &c., 10 Bush, Ky. 460.

In the case of Howard v. St. Louis Jewelry Co., 146 Ky. 160, 142 S.W. 241, the buyer of a quantity of jewelry declined to pay for it. His defense was that on the night he received it, it was destroyed by fire and he had never had an opportunity to inspect it. The trial court declined to submit this issue to the jury and this action was approved by the Kentucky Court of Appeals. In that case the whole question was whether or not a sale had been consummated.

It is my judgment that, under all the circumstances and conditions of this case, there had been a full and complete delivery of the goods within the meaning of the terms of the contract or arrangement between the parties and that the loss sustained should fall upon the buyer.