ALABAMA RURAL FIRE INSURANCE
COMPANY

v.

The UNITED STATES.

No. 332–76.

United States Court of Claims.

Feb. 22, 1978.

Christopher Sanger, Washington, D. C., for plaintiff; Stefan F. Tucker, Washington, D. C., counsel of record. Tucker, Flyer, Sanger, Reider & Lewis, Washington, D. C., of counsel.

James F. Merow, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant.

Before DAVIS, KASHIWA and BENNETT, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT

BENNETT, Judge:

This case involving the recision of a contract award to plaintiff comes before the court on defendant's motion for summary judgment and plaintiff's cross-motion for partial summary judgment. At issue is the authority of the Farmers Home Administration and of plaintiff to enter into a contract whereby plaintiff would provide insurance in 49 states and one territory on property held as security for Farmers Home Administration loans.

On October 19, 1973, the Farmers Home Administration (FmHA) issued a request for proposals which solicited bids from the insurance industry throughout the United States for the provision of insurance on property held as security for FmHA loans. Four companies responded, among them plaintiff.

Plaintiff's response, dated November 20, 1973, offered to provide such insurance for 14 Southern States. Following telephone discussions regarding the area to be served, on January 14, 1974, plaintiff told FmHA that it would be willing to provide such insurance for 49 states and the Virgin Islands. Idaho and Puerto Rico (for which satisfactory proposals had been received by defendant from two other companies) were not included. On February 14, 1974, Nick Chiddo, a FmHA contracting officer, notified plaintiff by letter that its offer had been accepted and that contract No. 12–20–1–7 had been awarded to plaintiff, effective immediately. Execution of a formal contract document was left for later.

On May 5, 1974, the contracting officer sent a telegram to plaintiff, stating,

UPON RECEIPT THIS TELEGRAM, YOU ARE INSTRUCTED TO CEASE INCURRING ANY EXPENSES UNDER CONTRACT 12–20–1–7 UNTIL FURTHER NOTICE. UNITED STATES GOVERNMENT WILL NOT BE RESPONSIBLE FOR ANY EXPENSES INCURRED IN VIOLATION OF THIS INSTRUCTION. THIS IS NOT, REPEAT NOT, A TERMINATION NOTICE.

On June 11, 1974, the contracting officer rescinded the notice of award, claiming that it had been null and void since its inception because plaintiff lacked authority to enter into such a contract, contrary to plaintiff's representations. On August 12, 1976, plaintiff sued here, claiming breach of contract and asking damages of $50,000, plus interest and costs.

The Government moved for summary judgment, claiming the contract was invalid because its performance would require activities of plaintiff which were forbidden both by statute and by the terms of an agreement between plaintiff's parent corporation and the United States. Plaintiff cross-moved for partial summary judgment on the issue of liability, claiming the contract was valid and that defendant was liable to plaintiff for costs incurred by the latter in preparing to perform the contract. Evaluation of these opposing contentions requires a review of the history of congressional enactments, executive administration, and plaintiff's origins, to which matters we now turn.

## I

The Federal Emergency Relief Act of 1933 [1] established a program for the rehabilitation of rural and urban areas struggling to recover from the depression. Under that statute, State Governors could apply for relief funds from the Federal Emergency Relief Administration. Applications were required to provide assurances of adequate administrative supervision. The mechanism devised to administer programs for rural areas was the creation of rural rehabilitation corporations within states desiring funds under the statute. Forty-three such corporations were established in 1934–35 to receive and administer funds in a like number of states. The funds were granted to the states, through their rural rehabilitation corporations, without any provision for their return to the United States, and the principal condition placed upon them was that they be applied for rural rehabilitation purposes in the states to which they were granted.[2]

In accordance with the 1933 legislation, plaintiff's parent, the Alabama Rural Rehabilitation Corporation (ARRC), was established on October 12, 1934. Paragraph III of its charter defined its purpose as being,

* * * to promote the development and betterment of communities, municipalities and counties in this State [Alabama] and for the promotion of other public purposes. * * *

Paragraph V of the same document begins, "This Corporation shall serve as an agency in carrying out rehabilitation activities of and/or for the State of Alabama."

In 1935 additional funds were appropriated for the rural rehabilitation program in the Emergency Relief Appropriation Act of 1935.[3] That Act lacked a provision, present in the 1933 Act and in two 1934 appropriation measures, allowing grants to the states, and in June 1935 the Comptroller General determined that funds made available under the 1935 Act could be expended only as a direct federal activity and not through the state rural rehabilitation corporations. Those corporations, therefore, were asked to assign their assets in trust to the United States, acting through the Administrator of the Resettlement Administration, to be used by the United States as

---

1. Ch. 30, 48 Stat. 55 (1933).

2. S.Rep.No. 403, 81st Cong., 1st Sess. (1949), *reprinted in* 1950 U.S.Code Cong.Serv., p. 2202.

3. Ch. 48, 49 Stat. 115 (1935).

trustee in carrying on the rural rehabilitation program in the various states.[4]

Most of the rural rehabilitation corporations, including ARRC, reached agreements with the United States for transfers in trust of their assets to the United States,[5] although some of the corporations did not make such agreements, and the United States never asserted federal ownership of their assets.[6] Those rural rehabilitation corporations which returned assets to the United States to be held in trust did so "upon the specific condition that they [the assets] be used only in a trust capacity in the appropriate States * * *."[7] The United States used various delegatees of the Secretary of Agriculture as trustees for the assets, that role being played by the Farmers Home Administration as of the time of the key legislation here.

The Rural Rehabilitation Corporation Trust Liquidation Act became law on May 3, 1950.[8] That Act, to the extent pertinent here, ordered the Secretary of Agriculture to liquidate trusts under the transfer agreements with the rural rehabilitation corporations of the several states and instructed him to convert the trust assets to cash as necessary to protect the interests of the United States and the corporations. Further, the Act authorized him to return all such assets to the state rural rehabilitation corporations upon proper request by their boards of directors. Applications for return of funds were to contain a covenant, "binding upon the applicant when accepted by the Secretary on behalf of the United States, * * * that the returned assets and the income therefrom will be used only for such of the rural rehabilitation purposes permissible under the corporation's charter as may from time to time be agreed upon by the applicant and the Secretary; * *."

ARRC's assets, however, continued to be held in trust by the United States, under the terms of a series of trust agreements which continued until 1970. An example of such an agreement is in evidence in this case. Under date of September 7, 1962, ARRC and defendant, acting through the Farmers Home Administration, agreed that the latter would continue to administer certain assets of ARRC, referred to as "the trustor." Article II, section 1, thereof said:

Section 1. The Government, as provided in this agreement, is hereby authorized to continue to administer, expend and use, *only in the State of the Trustor*, the trust assets * * *. [Emphasis supplied.]

On July 1, 1970, a liquidation agreement executed in April 1970 became effective. Under that agreement, the trust assets, "to the extent possible," were to be returned immediately to the Alabama Rural Rehabilitation Corporation, while remaining (unliquidated) trust assets were to be retained and administered by the Government until completely liquidated and returned to ARRC, which promised in the agreement:

5. * * * that the assets heretofore, hereby, or hereafter returned to the Corporation by the Government will be used by the Corporation only (1) to make or acquire Farm Ownership or Soil and Water Conservation loans to individuals heretofore or hereafter insured under the Consolidated Farmers Home Administration Act of 1961, as amended (7 U.S.C. § 1921 et seq.), and (2) for such other rural rehabilitation purposes permissible under the Corporation's Charter as may from time to time be agreed upon between the Corporation and the Government.

In 1971, ARRC decided to establish a subsidiary for the purpose of providing fire and casualty insurance to Alabama farm families then denied such coverage by regular commercial companies. It proposed such a plan to the Farmers Home Adminis-

---

4. See note 2, *supra*.

5. ARRC's first trust agreement with defendant was agreed to on Mar. 16, 1937.

6. See S.Rep.No. 403, *supra* note 2, at 2204.

7. *Id.*

8. Pub.L. 81–499, ch. 152, 64 Stat. 98 (1950); 40 U.S.C. § 440 (1970) (omitted as executed).

tration on July 19, 1971. FmHA lawyers of the Farm Ownership Loan Division expressed their approval on October 15, 1971, saying that selling such insurance to farmers and ranches in Alabama was well within the provisions of the charter of ARRC. The Government emphasized that,

> * * * it should be clearly understood that the company's activities should be restricted to rural areas where fire insurance is not available, and to farmers and ranchers in those areas. The coverage offered should be restricted to such insurance as the FHA [FmHA] requires when it makes a loan with either real or chattel property as security.

On October 28, 1971, the proposal was tentatively approved by the Administrator of the FmHA. His letter stated:

> * * * This letter provides approval and consent for use of the assets as you propose, provided the insurance company is established and operated only as a function of the ARRC or a totally owned subsidiary of the ARRC. This consent permits use of the Corporation's assets as required to be pledged in connection with the establishment and operation of this enterprise. It further requires the ARRC to obtain the charter for such insurance directly or as a subsidiary operation to be restricted primarily to the providing of rural fire insurance in acceptable areas and only to low income farmers and other low income rural residents in the open country who are unable to obtain satisfactory insurance from other sources.
>
> The consent granted herein is only for the establishment of an enterprise of this nature by the Corporation. When the proposed articles and operational procedures are developed, they should be resubmitted to this office for consideration prior to consummation of the incorporating action and establishment of the company.
>
> * * * Considering the above requirements, the consent granted herewith for use of the Corporation's assets for this purpose is tentative, subject to satisfactory conclusion as to any subsidiary corporation's activities and the further review

and consideration of the total transaction by this Agency prior to its consummation.

Despite the requirements of this letter, plaintiff, Alabama Rural Fire Insurance Company, was established as a subsidiary company of ARRC on July 13, 1972, although ARRC seems not to have requested approval by defendant of its incorporation documents until July 27, 1972. In any case, the Farm Ownership Loan Division and the Administrator of FmHA both wrote ARRC on August 7, 1972, giving their respective approvals for the subsidiary. The Administrator's letter referred to his letter of October 28, 1971, and stated:

> This is in response to your letter * * * asking us to concur in the proposal to use Alabama Rural Rehabilitation Corporation assets to establish an insurance company * * *. The company is designed to sell insurance to farmers and ranchers in rural areas of Alabama where it is impossible to obtain insurance from regular commercial companies.
>
> * * * The comments we made regarding the proposal then are still applicable and apply at this time. The proposal is within the provisions of the charter of the Corporation and we concur in use of Corporation assets for this purpose.
>
> It should be clearly understood that the company's activities would be restricted to rural areas where fire insurance is not available to farmers and ranchers in those areas.
>
> * * * * * *
>
> We wish you the best success in this endeavor to use the assets of the Alabama Rural Rehabilitation Corporation to benefit the Alabama rural population. * * *

In accordance with the approval granted by this letter, plaintiff sold insurance to rural Alabamians for about 1 years before it considered expanding its operations. It was the plan to expand which sired this litigation.

Plaintiff's decision to expand the scope of its operations beyond Alabama resulted from the request for proposals referred to

earlier, in which defendant sought companies willing to provide "backup" insurance, to provide insurance for—

 \* \* \* FHA borrowers who possess adequate insurance at the time a loan is made but who cannot or will not continue to obtain the required insurance. FHA is seeking insurers who will provide, on an annual basis, fire and extended coverage insurance without right of declination or cancellation, on real property that is held as security for an FHA loan. The insurance will cover loss or damage by fire, lightning, windstorm, hail, explosion, riot, civil commotion, aircraft, vehicles, or smoke.

A number of types of properties were listed as being held as security for FmHA loans, including farm properties, single-family housing, multiple-family housing, community facilities, recreation facilities, and business and industrial facilities.

Plaintiff was encouraged by FmHA's Administrator to respond to the request for proposals which, as just indicated, covers five types of properties in addition to farm properties. There is no evidence whatsoever that he suggested that plaintiff submit a bid concerning states other than Alabama. Yet, as indicated at the outset, plaintiff's proposal initially covered 14 states and, after discussions with the contracting officer, covered 49 states and the Virgin Islands. The contracting officer evidently saw no problem with plaintiff's extending its operations beyond the State of Alabama, or he may have thought the proposal acceptable because plaintiff planned to have a subcontractor issue the insurance in other states.[9] Ultimately, however, he concluded otherwise and on June 11, 1974, rescinded the

notice of award which had issued on February 14, 1974, as previously noted.

With this involved background in mind, we can more confidently turn to a discussion of the parties' arguments.

## II

The fundamental question in this case is whether it was permissible for plaintiff to contract with the Government to provide insurance outside Alabama. If it was not, the award was a nullity and the Government incurred no liability by rescinding the notice of award. *United States v. Mississippi Valley Generating Co.,* 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961); *John Reiner & Co. v. United States,* 325 F.2d 438, 440, 163 Ct.Cl. 381, 386 (1963), *cert. denied,* 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964). Accordingly, we must determine whether the contract contemplated here was forbidden by statute or the agreement between ARRC and the Government.

 The Government's basic contention is that ARRC's proposal involved prohibited activities because it required plaintiff to provide insurance in 14 (later 49) states, although plaintiff was forbidden to apply its assets elsewhere than in Alabama. Plaintiff's principal contentions are that the contract was permissible under the terms of its charter and of its parent's charter, that the activities involved could only help, but not hurt, rural Alabamians, that nothing in the statutes, regulations, or agreements prohibited the enterprise contemplated, and that defendant approved plaintiff's undertaking. We are persuaded that defendant is correct.[10] First we look to the case law for an understanding of the applicable legal standards.

---

**9.** There is some ambiguity concerning when plaintiff first notified FmHA of its intention to use a subcontractor to issue insurance in states other than Alabama, but resolution of this matter is unnecessary for the disposition of this case. We note, in passing, that the agreement between Alabama Rural Fire Ins. Co. and its subcontractor, Republic Service Co. of America, was entered into in March 1974. It was explicit in recognizing that issuing insurance outside Alabama was beyond plaintiff's abilities.

**10.** The contrary conclusion of an Alabama district judge does not concern us, for the United States Circuit Court of Appeals for the Fifth Circuit held that he lacked jurisdiction of the case, and that plaintiff's exclusive remedy is a suit for damages for breach of contract in the United States Court of Claims. *Alabama Rural Fire Ins. Co. v. Naylor,* 530 F.2d 1221 (5th Cir. 1976).

The parties rely on opposing lines of cases. Plaintiff works from *John Reiner & Co. v. United States* (hereafter *Reiner*), *supra,* and cases endorsing the principles there stated. In *Reiner,* the court held that, where the problem of legality of a contract was raised following award, the "court should ordinarily impose the binding stamp of nullity only when the illegality is plain." 325 F.2d at 440, 163 Ct.Cl. at 386. If the contracting officer has viewed the award as lawful, and it is reasonable to take such a view under the applicable statutes and regulations, the court should normally follow suit. *Id.* Therefore, the court stated, unless the invalidity of the award is clear, the contractor should be given the benefit of reasonable doubts and the award should be upheld. *Id.*

Defendant responds that the *Reiner* principles may be fine law but have no application here. Claiming that *Reiner* speaks to situations where the award's legality is *arguable,* defendant first contends that the award here was in *clear* conflict with the Rural Rehabilitation Corporation Trust Liquidation Act, several sections of the Federal Procurement Regulations, and the terms of agreements between defendant and ARRC. Defendant claims that the controlling cases are those such as *Schoenbrod v. United States,* 410 F.2d 400, 187 Ct.Cl. 627 (1969), and *Prestex Inc. v. United States,* 320 F.2d 367, 162 Ct.Cl. 620 (1963), in which noncompliance with statute or regulation made awards invalid. Plaintiff in turn argues that these cases are inapposite. Noting that *Schoenbrod* distinguished the *Reiner* line of cases by saying the illegality of the award in *Schoenbrod* was plain on the face of the statute and regulations, plaintiff contends that the face of the statute and regulations relied on by defendant here are insufficient to establish the illegality of the award. This point defendant conceded at oral argument, admitting that reference to legislative history and to the agreements between ARRC and defendant is necessary to prove its case.

Nonetheless, we think that *Prestex* is more analogous than *Reiner.* The reason for this is that plaintiff's argument relies too much on *Schoenbrod's* reference to illegality appearing on the face of the statute or regulations. What these opposing lines of cases reveal is that ambiguities concerning the legality of awards are resolved in the contractor's favor, but a clear showing of illegality in an award precludes any contract from arising. *Reiner* teaches that illegality must be clearly shown before a contract award will be invalidated. We hold, however, that illegality may be proved with reference to legislative history or agreements restricting a party's ability to contract. Otherwise stated, an unambiguous showing that a purported contract is impermissible will prevent an enforceable agreement from arising. This court is bound to strike down illegal contracts no matter how that illegality is proved.

The Rural Rehabilitation Corporation Trust Liquidation Act explicitly restricts [11] the use of assets returned to ARRC by the Federal Government to—

> * * * such of the rural rehabilitation purposes permissible under the corporation's charter as may from time to time be agreed upon by the applicant and the Secretary, * * *

We find no evidence to support plaintiff's claim that the necessary approval was obtained for contracting to provide insurance in 49 states, and there is abundant evidence that the Government did *not* grant such approval.

Plaintiff makes much of the broad powers in ARRC's charter emphasizing that ARRC's enumerated powers covered a wide range:

> III. D. To assist in the organization of subsidiary and related corporations
> * * *
>
> * * * * * *

11. More specifically, the Act requires that applications for return of trust funds contain "a covenant, binding upon the applicant when accepted by the Secretary on behalf of the United States, * * *" that the payments will be used in accordance with the language quoted above.

H. To enter into, make and perform contracts of every kind and description and to cooperate with any person, partnership, association, corporation, municipality, county, state, body politic, government, colony or dependence thereof;

\* \* \* \* \* \*

L. In general, to carry on any and all business and to do any other act \* \* \* necessary or convenient to the attainment of the foregoing objects, powers and purposes \* \* \*

Plaintiff argues that the Government's approval of ARRC and its charter evidences an agreement by the Government that plaintiff's activities were not intended to be confined to Alabama. But this argument ignores the language of the statute just quoted, requiring that returned assets be used only for activities which were both permissible under the corporation's charter and agreed to by the Secretary. To say the Secretary's approval of ARRC's broad charter constituted such approval would be to render surplusage the statutory language "such of [the purposes permissible under the charter] as may from time to time be agreed upon \* \* \*." The issue is not what ARRC's charter said but what the parties agreed to under the charter's statutory restrictions.

Plaintiff also contends that the Government authorized plaintiff's performance of activities contemplated by the award in question by approving the establishment of plaintiff as ARRC's subsidiary. For this argument, plaintiff relies heavily on the broad statements in plaintiff's articles of incorporation, which were submitted to the FmHA 10 days prior to the 1972 approval for the formation of plaintiff by the Administrator. But it is well known that such certificates often include boilerplate language authorizing all manner of activities which are not actually intended and in any case the Administrator's approval was quite specifically limited to authorizing a company "designed to sell insurance to farmers and ranchers in rural areas of Alabama where it is impossible to obtain insurance from regular commercial companies." Any-

way, the provision of the articles of incorporation upon which plaintiff relies states as one of 11 detailed paragraphs of its "purposes, objects and powers":

Art. II (h) To enter into and make all necessary contracts and agreements for its business with any person, partnership, association or corporation of any domestic or foreign state, government or governmental authority or any political or administrative subdivision or department thereof and to perform and carry out, assign, cancel or rescind any such contracts.

Surely this provision is a statement of the corporation's powers to be exercised in the performance of its lawful business, that of providing insurance to rural Alabamians. The provision, and defendant's approval of the articles in which it is found, cannot reasonably be read as authorizing plaintiff to engage in any form of business which might be the subject of a contract with any person or government, for there would be no limits on what plaintiff could undertake. The only reasonable way to read the articles of incorporation and defendant's letters approving the creation of plaintiff is to say that plaintiff was empowered to enter into contracts anywhere but only when incidental to the provision of insurance to rural Alabamians.

Plaintiff next suggests that, even if it were not authorized to issue insurance outside Alabama, its contract to provide insurance in 49 states was permissible because a subcontractor would have been used to issue the insurance in the other states. Under the terms of plaintiff's arrangement with Old Republic Insurance Company, that company, and not plaintiff, would have been the one liable on claims by insured parties claiming under their insurance policies. A corollary argument is that the contract to provide insurance outside Alabama could not hurt, but could only help, Alabamians. This argument rests on the conclusion that plaintiff's share of the profits derived from insurance policies sold outside Alabama could only increase the funds available for use inside Alabama, thus benefiting the rural population of Alabama.

The principal defect in these arguments is that they assume the success of the enterprise to provide insurance outside Alabama and overlook the possibility that unexpected events related to the provision of insurance outside Alabama might cause plaintiff's assets to be reduced. But what if the unlikely were to occur, and Old Republic somehow became unable to meet its obligation to provide insurance?[12] Plaintiff would have to find another subcontractor, or else fail in its obligations to defendant. If plaintiff had been unable to find a suitable replacement, plaintiff would have been liable for defendant's costs in finding someone to undertake the obligations for which, under the terms of the contract between plaintiff and defendant, plaintiff was primarily liable.[13]

The risk of losses or default by plaintiff's subcontractor is not the only way in which the contract here put Alabama assets to forbidden use. It did so by permitting plaintiff's executive vice president, Howard Barton, who was on plaintiff's payroll, to put roughly 80–90 percent of his work time toward Old Republic Company, work which he admitted extended far beyond the confines of the State of Alabama. In addition, plaintiff paid the travel expenses of Mr. Barton, although those expenses were associated with arrangements for the provision of insurance in states other than Alabama.

Other defects mar plaintiff's arguments. Its line of reasoning carries it too far. For example, if plaintiff were allowed to contract to provide insurance outside Alabama, so long as it used a subcontractor, why could it not, through subcontractors, operate oil wells in Texas or resorts in the Catskills? Such activities are clearly beyond the scope of the limited purposes for which plaintiff was approved, and so, too, is the provision of insurance outside Alabama. To this plaintiff might respond that operation of oil wells and resorts does not suit the purposes of the Rural Rehabilitation Corporation Trust Liquidation Act, while providing back-up insurance in the several states does serve those purposes. We would disagree. The purposes of the Act are served only when state rural rehabilitation corporations and their subsidiaries limit their conduct of business to the states of their incorporation.[14] The legislative history concerning rural rehabilitation corporations unmistakably evidences a congressional determination, faithfully and consistently complied with by executive agencies, that such corporations were to operate solely for the benefit of citizens of the states where they were incorporated.

Plaintiff finally contends that the award itself constituted such approval as was necessary to permit plaintiff to provide insurance outside Alabama. Plaintiff emphasizes that the Administrator of FmHA specifically invited plaintiff to submit its proposal, although, as we have said, plaintiff does not show us that he asked that the proposal apply to states other than Alabama.[15] Plaintiff also relies on the role of the contracting officer in expanding the scope of plaintiff's proposal from 14 states to 49. Plaintiff seems to believe that the

12. Admittedly, reinsurance arrangements reduced the risk that great losses would fall upon plaintiff, but the possibility for such losses cannot be denied.

13. Plaintiff seemed to contend at oral argument that the Government's approval of Old Republic as a subcontractor eliminated plaintiff's potential for liability should events go awry, but no suggestion was made that this approval worked a novation or otherwise discharged the liability plaintiff would have had on its contract with defendant.

14. As we have already indicated, it makes no difference that plaintiff intended to use a subcontractor to issue the insurance in states other than Alabama. Plaintiff would have been primarily responsible to defendant for the fulfillment of the promise to provide the insurance, and undertaking that obligation was beyond the limited purpose for which plaintiff was approved and it applied Alabama assets to forbidden use.

15. Although this is speculation, we think the probable explanation for the Administrator's encouragement to plaintiff to submit a proposal is that he thought plaintiff might wish to broaden the scope of its insurance activities *within Alabama*. The request for proposals, after all, concerned a broader range of insurance than plaintiff was originally offering to its Alabama clientele, as we have shown above.

contracting officer had sufficient authority to approve plaintiff's proposed activities and that such approval was given in the form of a contract award. We do not agree. Plaintiff was forbidden by the terms of ARRC's 1970 agreement with defendant from engaging in activities not specifically approved by the Secretary of Agriculture. Also, defendant allowed plaintiff's creation for the limited purpose of assisting rural Alabamians. That the contracting officer was a delegatee of the Secretary's power to engage insurance providers does *not* mean that he was authorized to determine, in accordance with the terms of the liquidation agreement between the Government and ARRC, whether providing insurance outside Alabama was a permissible activity for plaintiff. The United States is not bound by the unauthorized acts of its agents. *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947). Plaintiff has the burden of showing that the acts upon which it relies were authorized. *Housing Corp. of America v. United States,* 468 F.2d 922, 925, 199 Ct.Cl. 705, 711–12 (1972). On this record we cannot conclude that the contracting officer had the authority plaintiff claims he had,[16] and in fact the evidence indicates otherwise. The Secretary, acting through the Administrator of the FmHA, gave a limited approval to the activities of plaintiff, and this approval was not broad enough to cover the activities contemplated by the contract. There is no more to this case than that.

We have discussed the failure of defendant to approve the enterprise contemplated by the proposal to provide insurance outside Alabama, and we have shown reasons why such an enterprise was not approved. We believe this discussion also shows why the contract defendant rescinded was illegal under the Rural Rehabilitation Corporation Trust Liquidation Act. It is true that the Act relies primarily on the Secretary of Agriculture (and his agents) to determine the permissible scope of activities of rural rehabilitation corporations, but the Act's legislative history makes it clear that Congress intended that the assets of state rural rehabilitation corporations were to be used *only* for the benefit of their respective states. S.Rep.No. 403 is replete with language evidencing Congress' intent.

It should be noted that the Federal Emergency Relief Administration funds with which the present corporation trust assets were acquired in whole or in part, were granted to the States or corporations without any provision for their return to the United States, and that the principal condition placed upon them was that they be used for rural rehabilitation purposes in the particular States to which they were granted.

\* \* \* When the assets were transferred to the Federal Government under the terms of the transfer agreements, it was upon the specific condition that they be used only in a trust capacity in the appropriate States. \* \* \* [S.Rep.No. 403, *supra* note 2, at 2203–04.

We believe that Congress intended that the assets being returned to the corporations were to be used only for the benefit of residents of the respective states and that any contract award contemplating a broader use of the assets was forbidden. The contract was thus illegal, both under the Act and under Federal Procurement Regulations which required that no contract be made except in compliance with all applicable law and regulations. *See* 41 C.F.R. §§ 1–1.403, 1–1.1203–1(e) (1974). Accordingly, the contract was of no effect. *United States v. Acme Process Equip. Co.,* 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966); *Atlantic Gulf & Pac. Co. v. United States,* 503 F.2d 1407, 207 Ct.Cl. 995 (1975). The recision thus did not give rise to a legal claim.

Defendant's motion for summary judgment is granted, plaintiff's cross-motion for partial summary judgment is denied, and the petition is dismissed.

---

**16.** Given this failure of proof, we have no need to concern ourselves with the ambiguity over when the contracting officer was first notified about the involvement of Old Republic in the arrangements to provide insurance outside Alabama.