**AMERICAN TELEPHONE AND TELEGRAPH COMPANY, Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant/Cross–Appellant.**

Nos. 95–5153, 95–5154.

United States Court of Appeals, Federal Circuit.

Sept. 24, 1997.

C. Stanley Dees, McKenna & Cuneo, L.L.P., Washington, DC, argued for Plaintiff–Appellant. With him on the brief was J. Keith Burt.

Bryant G. Snee, Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued, for Defendant/Cross–Appellant. With him on the brief was Frank W. Hunger, Assistant Attorney General. Of counsel on the brief were Robert D. Hogue and James H. Haag, Office of General Counsel, Department of the Navy, Arlington, VA.

Caryl A. Potter, III, Sonnenschein Nath & Rosenthal, Washington, DC, for Amici Curiae. With him on the brief was Roger K. Heidenreich, St. Louis, MO.

Before NEWMAN, PLAGER and RADER, Circuit Judges.

Opinion for the court filed by Circuit Judge PLAGER. Dissenting opinion filed by Circuit Judge PAULINE NEWMAN.

PLAGER, Circuit Judge.

Congress prohibited the expenditure by the Department of Defense ("DOD") of federal funds for certain types of research and development contracts. This case is about the consequences, legal and financial, to a contractor and to the Government when they perform a purported contract made in apparent violation of the Congressional prohibition of expenditure of money in that manner.

American Telephone and Telegraph Company ("AT & T") entered into a contract with the United States ("Government") for a fixed-price contract involving research, development and production of a ship-towed, undersea surveillance system known as the Reduced Diameter Array ("RDA"). AT & T, claiming that it incurred expenses exceeding the contract's fixed price by several multiples, submitted to the contracting officer a claim for recovery of these added expenditures. The claim was denied.

AT & T filed for recovery in the United States Court of Federal Claims. The Court of Federal Claims, in response to the parties' cross motions for summary judgment, concluded that the contract was void as a matter of law and could not be reformed as requested by the contractor. The court held, however, that the contractor might be entitled to the remedy of quantum meruit, measured by the value of goods and services received by the Government. *American Telephone & Telegraph v. United States*, 32 Fed. Cl. 672, 682–83 (1995).

Because the trial court's ruling confronted the parties with the prospect of an extended trial on whether the Government had been unjustly enriched, and if so by how much, and because the ruling placed in doubt the legality of a large number of DOD contracts of a similar nature, the trial court certified, and we accepted, the case for interlocutory appeal. Both parties appeal the judgment of the trial court. We affirm-in-part and reverse-in-part.

## BACKGROUND

The ability to locate enemy submarines within broad ocean areas has been considered the single most important element of an effective antisubmarine warfare system. The Reduced Diameter Array is part of the larger Surveillance Towed–Array Sensor System ("SURTASS"), which provides un-

dersea surveillance of submarines. The SURTASS-equipped surface ship collects acoustic data by towing its electronic sonar array—a long, slender flexible hose, approximately 8,000 feet long, containing hydrophones and other sensors and electronics—through the ocean. Once the sonar array collects acoustic data, the SURTASS ship processes the collected data with its onboard electronics and transmits the data through its communications equipment to a satellite and ultimately to a shore-based facility. In the effort to monitor Soviet submarines, SURTASS was one of the Government's most important ongoing programs.

On December 31, 1987, the Navy awarded AT & T a fixed-price incentive fee contract with an initial contract ceiling price of $19 million for research and development of the RDA.[1] The RDA was to replace the existing SURTASS sonar array, which was based on older technology. In addition to basic research and development, the RDA contract provided for delivery and testing of a fully functioning engineering development model. The contract also contained an option for a second engineering development model and an option to purchase three production-level RDA subsystems. Both options have been exercised by the Navy.

At the time this suit was filed, performance of the contract was essentially complete. The work, however, was considerably more costly than the parties had anticipated, or at least than the contract contemplated. Despite AT & T's pleas to the Government not to elect purchase of the production-level units because of the cost overruns already experienced by AT & T, the Government ordered and AT & T produced in accordance with its contract three RDA units, all of which were delivered under the RDA contract.

Over the course of the contract the agreed contract price increased to $34.5 million. Even so, AT & T claims to have incurred much higher contract costs, approaching $101 million. After its claim for reimbursement by the Government for its extra costs was rejected by the contracting officer, AT & T filed suit in the Court of Federal Claims, seeking approximately $60 million in extra costs.

In its opinion, the Court of Federal Claims held that the contract was invalid because, under § 8118 of the Department of Defense Appropriations Act, Pub.L. No. 100–202, § 8118, 101 Stat. 1329, 1329–84 (1987), the Government had no authority to enter into such a contract. However, citing *United States v. Amdahl,* 786 F.2d 387 (Fed.Cir. 1986), the trial court concluded that it had jurisdiction to award relief based on a theory of unjust enrichment, and announced its intention to engage in fact-finding to determine if the failure to grant relief to AT & T would "unjustly" enrich the Government, and if so, by how much. Both the Government's motion to dismiss or for summary judgment, and AT & T's motion for partial summary judgment were denied.

In response to the parties' concerns with this disposition of their motions, the trial court agreed to certify under 28 U.S.C. § 1292(d)(2) an interlocutory appeal from its order, and we accepted the case for interlocutory appeal.

## DISCUSSION

### A. The Statute

#### 1.

When enacting the annual appropriations bills for the various federal agencies, Congress often incorporates instructions regarding use of the funds for specific purposes. In 1987, the bill, which contained the appropriation for the Department of Defense, contained instructions, *inter alia,* for further development of the SDI research program, for expeditious development and operational testing by the Army of the M72E4 weapons

---

1. Various dollar amounts are stated in the appellant's brief, the respondent's brief, and the Court of Federal Claim's opinion. For example, the Government states that offers were solicited with an estimated contract price of approximately $19 million, that at contract award a $2 million increment was added, and that AT & T's bid was for $29 million. AT & T states that the RDA contract was for $19 million. The trial court referred to the contract as having an adjusted ceiling price of $34.5 million. These numbers can no doubt be reconciled, but in view of our disposition, it is unnecessary for us to do so.

program, for the lifting of monetary limits on vehicles purchased for intelligence activities, and for prohibiting the obligation and expenditure of funds for certain fixed price-type contracts. This last provision was § 8118 of the bill, and read:

> None of the funds provided for the Department of Defense in this Act may be obligated or expended for fixed price-type contracts in excess of $10,000,000 for the development of a major system or subsystem unless the Under Secretary of Defense for Acquisition determines, in writing, that program risk has been reduced to the extent that realistic pricing can occur, and that the contract type permits an equitable and sensible allocation of program risk between the contracting parties: *Provided,* That the Under Secretary may not delegate this authority to any persons who hold a position in the Office of the Secretary of Defense below the level of Assistant Under Secretary of Defense: *Provided further,* That the Under Secretary report to the Committees on Appropriations of the Senate and House of Representatives in writing, on a quarterly basis, the contracts which have obligated funds under such a fixed price-type developmental contract.

Pub.L. No. 100–202, § 8118, 101 Stat. 1329, 1329–84 (1987). The parties do not dispute that the contract at issue here is a fixed price-type developmental contract in excess of $10,000,000, and that the Under Secretary did not make the determination, or the report, required for such fixed price-type contracts. Nor is there any dispute about the fact that the contract was entered into after the enactment of § 8118, and that at least some if not virtually all of the funds paid to AT & T under the contract came from appropriations subject to the proscription of § 8118.[2] They do disagree about two key issues: first, whether the contract is encompassed within the terms of § 8118, specifically, whether it is for "a major system or subsystem"; and, second, even if it is, what are the consequences.

AT & T argues that the contract falls squarely within the terms of § 8118, that is,

the RDA is a major system or subsystem, and therefore the contract is invalid as written. According to AT & T, the contract should be rewritten by the court to permit payment as a cost-based type contract, which is what Congress must have intended. (Though the parties do not expressly so state, presumably a cost-based type contract would entitle AT & T to be paid by the Government for all its allowable costs in performing the contract, plus an appropriate profit margin.) As an alternative, AT & T argues it is entitled to equitable relief, under a theory of quantum meruit, for the money it spent in performing the contract.

The Government takes the position that the RDA project that is the subject of the contract at issue is not a "major system" as that term is defined elsewhere in the law, and that therefore § 8118 does not apply to it. Even if it does apply, a violation of the statute does not render the contract void simply at the behest of a contractor, argues the Government, and thus AT & T is entitled to nothing more than the contract permits.

Our first task, then, is to determine whether the contract entered into between the parties was a contract for a "major system or subsystem," and thus subject in the first instance to the prohibitions of § 8118. In the absence of a definition in the section itself, and because the phrase cannot be said to have a "plain meaning," we take a brief excursion into the history of § 8118 to help understand what Congress intended when it added that provision to the Appropriations Act.

### 2.

For decades, policy debates concerning the most advantageous contract type for large scale, cutting-edge weapons systems' research and development projects have occurred within the DOD and its constituent services. These debates reflect, in part, the tension between the desire to foster the free market and competitive goals embodied by fixed price-type procurement, and the desire to accommodate the uncertainty inherent in

---

**2.** The prohibition contained in § 8118 was repeated in essential respects in subsequent years' appropriations acts through 1993.

such cutting-edge research and development efforts.

Defense Department acquisition policy has reflected these debates, and has vacillated between the use of cost-based type and fixed price-type contracts. Because the development of cutting-edge weapons systems often involves unknown technical risks having unknown solutions at the time they become known, the problem centers on finding a mechanism for reasonably allocating the risks inherent in such efforts, while protecting the Government from open-ended liability for uncontrolled spending.

In the 1960s the DOD followed a policy of fixed-price development contracting under the "Total Package Procurement" concept. Although in theory this policy would increase competition and cost discipline, in practice, because of the inherent risks in such programs, it resulted in program delays, contractor claims, and protracted litigation. *See generally* Norman R. Augustine & Robert F. Trimble, *Procurement Competition at Work: The Manufacturer's Experience*, 6 Yale J. on Reg. 333, 345–47 (1989); *see also* Surveys & Investigations Staff, *Report to the Committee on Appropriations, U.S. House of Representatives, on Navy Fixed Price Contracting in the RDT & E Account*, 100th Cong., 1st Sess. ii (1987).

In 1971, DOD Directive 5000.1 prohibited Total Package Procurement and established a policy favoring the use of cost-based type contracts for development efforts. This policy was reflected also in the Federal Acquisitions Regulations governing R & D contracts. *See* 48 C.F.R. § 35.006(c) (1996). In the mid–1980s, however, the Navy returned to fixed-price contracting for certain types of development contracts. Congress became aware of this. After an investigation by the House Appropriations Committee staff and hearings before the Defense Subcommittee of the House Committee on Appropriations, at which the Navy's current practice was identified with the unsatisfactory experience of the past, the House inserted language into the 1988 DOD appropriations bill which, as modified in the conference between the House and Senate committees, became § 8118. The modified language was included in the 1988 Continuing Appropriations Act, Pub.L. No. 100–202, 101 Stat. 1329 (1987), enacted December 22, 1987.

The original version in the House bill contained, in addition to the requirement of Under Secretary approval, a requirement that the Under Secretary provide advance notice to Congress of the intention to authorize such a contract. In the enacted § 8118 and its progeny, that requirement was eased to one of after-the-fact reporting.

With regard to the phrase "major system or subsystem," the original House version denied funding to "fixed price-type contracts for the development of a major system or subsystem." The enacted version substituted the phrase "fixed price-type contracts in excess of $10,000,000 for the development of a major system or subsystem." Neither version incorporated a definition of the phrase, or otherwise explained its meaning.

Both the House report by the House Committee on Appropriations and the report of the conference committee made it clear that the purpose of the new provision was to express Congress's unhappiness with the continued use of fixed price-type contracts for R & D procurements, and in particular with the Navy's practice which was seen as inconsistent with DODD 5000.1. *See* Surveys & Investigations Staff, *Report to the Committee on Appropriations, U.S. House of Representatives, on Navy Fixed Price Contracting in the RDT & E Account*, 100th Cong., 1st Sess. ii (1987). ("Although Navy officials at the headquarters level have predicted immense success for the acquisition policy, ... fixed price contracting ... [has] generally proved unsuitable in an R & D environment."); H.R. Conf. Rep. No. 100–498, at 624 (1987) ("Fixed price contracts are normally not appropriate for research and development phases.").

The Government argues that, despite the obvious effort by Congress to bring this contracting activity within defined limits, the statute does not apply to the RDA contract. This is because, argues the Government, the RDA is not a "major system." This argument is bolstered by a memorandum issued by the Under Secretary of Defense for Acquisition some six weeks after passage of the 1988 Act, defining the term "major system"

by reference to a definition contained in a different and pre-existing part of the laws governing DOD acquisitions: "[t]he definition of major system at 10 U.S.C. § 2302(5) is the definition of that term for the purpose of this section [*i.e.*, § 8118]." Under Secretary of Defense for Acquisition Costello, *Memorandum for Service Acquisition Executives, Directors of the Defense Agencies* 1 (Feb. 11, 1988). Since the contract for the RDA system is less than $75,000,000, the minimum threshold under § 2302(5), and, as discussed below, does not otherwise fit the statutory definition, the Government concludes that AT & T's contract is not within the scope of § 8118.

Section 2302(5), defining the term "major system," appears in the definitions section of the general procurement chapter, chapter 137, of Subtitle A—General Military Law, of Title 10, Armed Forces. 10 U.S.C. § 2302(5) (1994). By its terms, the definitions section is applicable to the various sections and subsections of chapter 137. The question is, does it have applicability to § 8118 of the 1988 Continuing Appropriations Act? A reading of § 2302(5), as it stood at the time of the events involved here,[3] suggests that its purpose is to provide guidance in the procurement of a wide range of goods and services:

> The term "major system" means a combination of elements that will function together to produce the capabilities required to fulfill a mission need. The elements may include hardware, equipment, software or any combination thereof, but excludes construction or other improvements to real property. A system shall be considered a major system if (A) the Department of Defense is responsible for the system and the total expenditures for research, development, test, and evaluation for the system are estimated to be more than $75,000,000 (based on fiscal year 1980 constant dollars) or the eventual total expenditure for procurement of more than $300,000,000 (based on fiscal year 1980 constant dollars); (B) a civilian agency is responsible for the system and total expenditures for the system are estimated to exceed $750,000 (based on fiscal year 1980 constant dollars) or the dollar threshold for a "major system" established by the agen-

cy pursuant to Office of Management and Budget (OMB) Circular A–109, entitled "Major Systems Acquisitions", whichever is greater; or (C) the system is designated a "major system" by the head of the agency responsible for the system.

10 U.S.C. § 2302(5) (1988).

It is not immediately obvious that Congress, in adding the prohibition of § 8118 to the 1988 DOD appropriation, intended to limit the section's remedial effect only to those contracts which fall within the specific terms of § 2302(5). In addition to the general thrust of § 8118, and the legislative history that preceded and accompanied its enactment, the introduction of the $10,000,000 threshold suggests that Congress was more focused on the size of the specific contract than on the size of the overall project, the latter being the basic standard of the definition contained in § 2302(5).

If Congress's concern is for the consequences of fixed price-type contracts involving R & D, with a specific dollar ceiling, the size of the overall program would seem largely irrelevant. Furthermore, the statutory definition specifically permits the head of the agency responsible for the system to designate a system as a "major system," or, presumably, not to designate so. Given Congress's displeasure with the Navy's activities in this regard, it seems implausible that Congress would purposely grant that discretion to the agency head whose conduct it was trying to control.

There is a further difficulty with the Government's heavy reliance in this case on the Under Secretary's memorandum and the definition contained in § 2302(5). That definition is only of the term "major system." Nothing is said about the term "subsystem" with which "major system" is coupled in the Appropriation Act's § 8118. The Government in its brief refers to the "RDA contract," and occasionally to the "RDA system." AT & T consistently refers to the subject of the contract as the "RDA subsystem." Neither party favors us with an explanation of why one term is more appropriate than the other.

---

**3.** Subsection 2302(5) was amended in 1996. *See* Pub.L. No. 104–201, 110 Stat. 2605 (1996).

On its face, the term "subsystem" would appear to be the more appropriate one. Both the Government and AT & T appear to view the RDA as being a part of the larger SURTASS submarine surveillance system. Yet even calling it a subsystem does not solve the statutory interpretation problem. There remains the question of whether Congress intended the adjective "major" to apply both to "system" and to "subsystem." And even if the phrase should be read as if it said, "major system or major subsystem," in absence of a statutory definition of a "major subsystem," is RDA such a subsystem? All of which suggests that Congress may not have had in mind the definition in § 2302(5) when it used the phrase "major system or subsystem" in § 8118.

When Congress enacts legislation establishing a regulatory program and leaves to the agency broad discretion in the manner in which the program, or aspects of it, are to be implemented, it is for the agency, and not the courts, to decide how that discretion is to be exercised. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). If the exercise of discretion is a properly considered and promulgated action by the agency, and within the range of permissible choice, courts will not substitute their judgment for that of the responsible agency official. *See, e.g., Merck & Co. v. Kessler,* 80 F.3d 1543, 1549 (Fed.Cir.1996); *Federal–Mogul Corp. v. United States,* 63 F.3d 1572, 1579 (Fed.Cir.1995). The Government argues that the Under Secretary's memorandum incorporating the statutory definition of § 2302(5) into § 8118 should be given such deference.

In addition to the fact that the Under Secretary's memorandum addresses only the definition of a major system, not a subsystem, there is a further problem with this argument. The prohibition on Government conduct here is not a delegation of broad discretion to an agency. On the contrary, it is an express limitation upon governmental discretion, and is designed to inhibit the conduct of the very official who is claimed to have the discretion to interpret the provision as he sees fit. We cannot see in this legislation an intent to permit agency discretion of that order.

Taking into consideration the history of § 8118, and above all its phrasing, we conclude that Congress intended this prohibition to have the effect of significantly limiting the ability of the DOD, and in particular the Navy, to enter into these fixed price-type R & D contracts for significant projects, and that the Congressional purpose best can be realized by construing the phrase "major system or subsystem" to have the ordinary meaning such a phrase connotes, and not the technical meaning that would be ascribed by an application of § 2302(5). Reading "major system or subsystem" in its ordinary sense, the RDA contract here, substantially exceeding the $10,000,000 ceiling, and having a significant role in the upgrading of the SURTASS program, easily falls within the scope of the § 8118 provision.

The Government's argument before us to the contrary notwithstanding, this reading of § 8118 will not come as a surprise to senior officials in the DOD. In March 1991, the newly-appointed Director of Defense Procurement in the DOD spoke to the defense procurement community at a conference in Williamsburg, Virginia. Among other topics, she reviewed the history of the DOD's fixed price-type R & D contracting. She concluded the discussion by saying:

> The negative consequences of the inappropriate use of fixed-price development contracts have become so clear that the department's senior management has said "no more." The Under Secretary of Defense for Acquisition now personally approves any planned fixed-price development contract in excess of $25 million (and those over $10 million, on a major program). However, the consequences of the large, long-term fixed price development contracts that were awarded several years ago will be with us for years to come.

Eleanor R. Spector, Address at the Department of Defense Procurement Conference (Mar. 20, 1991).

It is clear that the Department viewed the problem as primarily keyed to the individual R & D contract, and treated the concept of major programs in its generic sense. Her prophetic concluding words, reflecting the purpose behind Congress's enactment of

§ 8118, are borne out by this litigation. The decision of the Court of Federal Claims on this point is affirmed.

## B. The Relief Available

Logically, the next question is, what is the legal consequence when parties attempt to create a contract in the face of a prohibition such as that contained in § 8118. AT & T argues that the statute prohibits the contract as a fixed price-type contract, and as a consequence the contract is illegal and thus void. Since the Navy only had one legally-supportable basis for awarding the RDA contract—to award it as a cost-based type contract—it follows, argues AT & T, that the requirements of § 8118 were, by operation of law, incorporated into the RDA contract; for purposes of granting AT & T a remedy the contract should be understood as a cost-based type contract.

The Government responds that, even assuming that § 8118 applies and was violated, that violation cannot render the completed RDA contract void. This is for three reasons: (1) no authority holds or suggests that circumstances such as these can result in a contract being declared void from its inception at the insistence of the performing contractor; (2) the authorities that do address contract invalidity and allocation of risk preclude such a holding; and (3) the circumstances of this case present no reason to create a sweeping new basis upon which to challenge the enforceability of a contract with the United States.

In analyzing the problem, it is important to keep clearly in mind what is meant when a contract is termed "illegal," a term used with abandon in the parties' briefs. That term encompasses a broad range of possible defects in contractual arrangements, from contracts that are inherently unenforceable (a contract to murder someone), to contracts in which one party is incompetent to contract (due to age or mental infirmity), to contracts in which a necessary term is omitted (such as price or date of performance), to contracts which are in some respect in violation of a positive rule of law (such as the case here).

The Government argues that the cases that have held contracts to be void or invalid upon the basis of a statutory or regulatory violation have involved provisions that explic-itly limited the very authority of the parties to enter into the contract, or expressly prohibited the contract altogether. *See, e.g., Clark v. United States,* 95 U.S. 539, 542, 24 L.Ed. 518 (1877); *Urban Data Sys., Inc. v. United States,* 699 F.2d 1147, 1150 (Fed.Cir. 1983); *Alabama Rural Fire Ins. Co. v. United States,* 215 Ct.Cl. 442, 572 F.2d 727, 729 (1978). The Government notes that none of the "illegality" cases cited by AT & T deal with funding deficiencies. In the Government's view, a restriction on the availability of funding is not tantamount to a lack of authority to contract. Therefore, concludes the Government, § 8118 does not render the RDA contract void from its inception.

AT & T responds that the question is not whether § 8118 restricted the Navy's ability to fund fixed price-type development contracts, but whether the restrictions on the use of funds contained in § 8118 were "mandatory." If so, argues AT & T, citing *New England Tank Indus., Inc. v. United States,* 861 F.2d 685 (Fed.Cir.1988), a contract entered into in violation of § 8118 is illegal and void.

The Court of Federal Claims concluded that § 8118's requirement for a written determination upholding the pricing integrity of a fixed-price development contract operates as a constraint on the contracting process intended for the protection of both Government and contractor. We agree with the Court of Federal Claims on this point, and affirm its conclusion. The congressional purpose is abundantly clear: "None of the funds provided ... may be obligated or expended for [certain] fixed price-type contracts." Department of Defense Appropriations Act, Pub.L. No. 100–202, § 8118, 101 Stat. 1329, 1329–84 (1987). The attempt by the Navy to obligate or expend funds for a contract not properly authorized by Congress is ineffective to either commit or make use of federal dollars. *See, Office of Personnel Management v. Richmond,* 496 U.S. 414, 424, 427–28, 110 S.Ct. 2465, 2471, 2472–74, 110 L.Ed.2d 387 (1990). The Government's attempt to contract fails. No valid contract was or could be entered into in face of the express congressional prohibition. *See, e.g.,* 31 U.S.C. § 1341 (1994) ("Limitations on ex-

pending and obligating amounts" (the "Anti-deficiency Act").).

The remaining question is what follows from the conclusion that the "contract" between the parties was an invalid attempt to enter into a contract. AT & T agrees that the contract was void *ab initio,* but seeks reformation of the contract into a cost-based type contract. The trial court correctly differentiated between an otherwise valid contract that contains a prohibited term or clause and one that is void from the inception. The court noted that the former may be amenable to reformation, but that a court has no power to remake that which was never established in the first instance. 32 Fed.Cl. at 682 (citing *Hedges v. Dixon County,* 150 U.S. 182, 192, 14 S.Ct. 71, 74–75, 37 L.Ed. 1044 (1893)).

The position on this issue taken by AT & T is internally inconsistent. Even if we grant that the effect of § 8118 is to cause the DOD to prefer cost-based type contracts for R & D efforts over the fixed price-type, that implicit preference resulting from the statute does not rise to the level of an expressly mandated contract provision making an attempt to contract one way become something else. Congress knows how to impose mandatory provisions in contracts. It did not do that in § 8118. The determination of the trial court that the contract is void and not subject to reformation is affirmed.

The trial court, however, did not end the case there. The court concluded that the consequence of its determinations was to leave the parties with an implied-in-fact contract, with compensation to be awarded on a quantum meruit basis. We cannot agree. The concept of implied-in-fact contract is not for the purpose of salvaging an otherwise invalid contract. An implied-in-fact contract arises when, in the absence of an express contract, the parties' behavior leaves no doubt that what was intended was a contractual relationship permitted by law. *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1326 (Fed.Cir.1997). In the case here, the contractual relationship was not permitted by law, and the rubric of implied-in-fact contract is not appropriate.

On the basis of the implied-in-fact contract, the trial court announced its inten-tion to grant quantum meruit relief. It is well established that the Court of Federal Claims does not have the power to grant remedies generally characterized as those implied-in-law, that is, equity-based remedies, as distinct from those based on actual contractual relationships. *Hercules, Inc. v. Unites States,* —— U.S. ——, ——, 116 S.Ct. 981, 985, 134 L.Ed.2d 47 (1996); *Trauma Serv. Group,* 104 F.3d at 1324–25. Quantum meruit is the name given to an implied-in-law remedy for unjust enrichment. As a general rule, it falls outside the scope of relief available through the Court of Federal Claims. *Id.*

The trial court cited the 1986 Federal Circuit case of *United States v. Amdahl Corp.,* 786 F.2d 387 (Fed.Cir.1986), as a basis for quantum meruit relief. In that case, the Federal Circuit stated that although the contract at issue in the case was invalid, the contractor was "not entirely without remedy" because:

> Where a benefit has been conferred by the contractor on the government in the form of goods or service, which it accepted, a contractor may recover at least on a quantum valebant or quantum meruit basis for the value of the conforming goods received by the government prior to the rescission of the contract for invalidity.

*Id.* at 393. However, *Amdahl* is distinguishable from plaintiff's situation because contracting authority was not at issue in the case. The contract in *Amdahl* was eventually rescinded not because the government representative lacked authority, but because its continued performance violated statutory and regulatory requirements. If the Government attempts to contract without authority, as in this case, there can be no contract on which to award relief for partial performance. While it is true that the *Amdahl* court discussed the matter under the heading of quantum meruit, the circumstances of the case suggest it was more properly labeled equitable relief allowed under the Contract Disputes Act, 41 U.S.C. §§ 601–613, when a contract, express or implied-in-fact, is present.

Since AT & T never had a contract with the Government, and it is not entitled in an

action in the Court of Federal Claims to relief based on a theory of unjust enrichment, AT & T has not stated a claim upon which relief can be granted. The Government is entitled to judgment in its favor. The decision of the trial court to the contrary, in which it would consider the award of relief to AT & T in this case, is reversed.

This is not to say that AT & T is without any remedy. It would appear that the Government is in possession of goods, the RDA equipment, originally manufactured and owned by AT & T. There is nothing to suggest that AT & T intended to make a gift of that equipment to the Government, and much to suggest the contrary. Whether AT & T may replevy the goods, or bring an appropriate action for the value of its wrongful retention and use by the Government, is not before us.

## CONCLUSION

The order of the Court of Federal Claims is affirmed-in-part and reversed-in-part. The matter is remanded to that court with instructions to grant judgment to defendant Government on AT & T's contract claim.

*AFFIRMED-IN-PART, REVERSED-IN-PART & REMANDED.*

PAULINE NEWMAN, Circuit Judge, dissenting.

AT & T and the Navy entered into a fixed price research and development contract relating to new and strategically essential technology for submarine detection. AT & T fully performed its contract obligations, at a cost that AT & T says was significantly higher than the contract fixed price. AT & T says that the Navy urged this performance, although research costs soared. AT & T raises the issue of appropriate compensation, for which it brought suit in accordance with the Contract Disputes Act.

The panel majority holds that AT & T never had any right to any payment for its work done under the contract, and that the Navy is off the hook for the massive benefits demanded and received, even had it never paid a cent. The majority holds that because of the Navy's transgression in complying with congressional oversight requirements, "AT & T never had a contract with the Government." My colleagues hold that AT

& T might now try to retrieve the electronic equipment from the Navy, but it can not be paid for it, even had there been no payment whatsoever.

It is undisputed that both AT & T and the Navy performed this contract over a period of nearly five years. It can not be correct for this court to charge AT & T with oversight responsibility for whether the Navy also carried out the internal assessment and approval that Congress asked it to do, or whether the Navy filed the reports with Congress that Congress requested. AT & T bore no responsibility for the Navy's compliance with these requirements, and indeed could not know if the Navy had complied. *See E. Walters & Co. v. United States,* 217 Ct.Cl. 254, 576 F.2d 362, 367 (1978) ("The discipline to be administered in such cases is a responsibility of the cognizant procurement officials within the agency....") It is inappropriate to assess AT & T with the consequences of the Navy's internal lapses, if indeed there were such. If the Navy did not fulfill its obligations to the Congress, it does not follow that "AT & T never had a contract with the Government," as my colleagues now rule.

Not every violation of a statute or regulation, nor the failure to comply with a congressional request for reports and internal approvals, renders a contract void or invalid—particularly after it has been fully performed. The oversight requirements of § 8118 of the Appropriations Act do not go to the core of federal procurement. Indeed, contracts between the government and a private party have been sustained even when statutes and regulations relating to the procurement or award process have been violated. *E. Walters,* 576 F.2d at 367 ("the fact that a procurement practice is prohibited does not necessarily mean that it is therefore actionable"); *see Walsh v. Schlecht,* 429 U.S. 401, 408, 97 S.Ct. 679, 685, 50 L.Ed.2d 641 (1977) (requiring preservation of the validity of contracts that are not plainly illegal); *United States v. New York & Porto Rico S.S. Co.,* 239 U.S. 88, 92, 36 S.Ct. 41, 42, 60 L.Ed. 161 (1915) (when government did not comply with formal requirements, contract not illegal and recovery permitted upon quantum vale-

bat when performed) (citing *United States v. R.P. Andrews & Co.*, 207 U.S. 229, 243, 28 S.Ct. 100, 105, 52 L.Ed. 185 (1907)); *Trilon Educational Corp. v. United States*, 217 Ct. Cl. 266, 578 F.2d 1356, 1361 (1978) (the fact that the contracting officer may have disregarded a directive of the ASPR does not ordinarily render the contract a nullity); *Ocean Tech., Inc. v. United States*, 19 Cl.Ct. 288, 294 (1990) ("Performance having been fully completed, holding the obligation to pay unenforceable is not a position favored in this circuit.").

In contrast, those contracts that have been held void or invalid on the ground of a statutory or regulatory violation have been clearly illegal in a material aspect, in that they violated provisions explicitly limiting the authority of a party to enter into the contract, or expressly prohibiting the contract altogether. *E.g., Clark v. United States*, 95 U.S. 539, 542, 24 L.Ed. 518 (1877) (unlawful for contracting officers to make contracts that violate the statute of frauds); *Urban Data Systems, Inc. v. United States*, 699 F.2d 1147, 1150 (Fed. Cir.1983) (recovery based on implied-in-fact contract after contracts declared invalid because they contained pricing clauses in plain violation of statute); *Alabama Rural Fire Ins. Co. v. United States*, 215 Ct.Cl. 442, 572 F.2d 727, 729, 736 (1978) (the statute creating the plaintiff corporation expressly forbade plaintiff from entering contract).

However, § 8118's assessment and reporting requirements neither limited the authority of the Navy to enter the Reduced Diameter Array contract with AT & T nor prohibited the use of a fixed price contract; the contract was not illegal and is not invalid. Indeed, the Navy agrees that invalidation of the contract is not available on the ground that the Navy failed to comply with internal approvals and reporting at the political level. In enacting § 8118 Congress did not require, or even suggest, that a completed contract would be invalidated if the legislative goal of overseeing Defense Department research and development contracts were thwarted by inadequate defense agency compliance. Congress plainly stated the contrary intent:

> It is the intent of the committee that this section be applied in a manner that best serves the government's interests in the

long term health of the defense industry, and that this section not be used as the basis for litigating the propriety of an otherwise valid contract.

S. Rep. No. 100–326, at 105 (1988) (referring to the 1989 reenactment of § 8118).

In addition to stating that it did not intend litigation of an otherwise valid contract to result from § 8118 restrictions, the legislative history demonstrates that Congress intended to monitor Defense Department usage of fixed price development contracts, not to prohibit their use entirely. By various amendments Congress adjusted the enforcement provisions of § 8118 and successor enactments by simply changing the nature and timing of the Department's reports to Congress. In enacting § 8118 the congressional conferees explained that the remedy set by this legislation was the requirement for quarterly reports after contracts were let "instead of the more rigorous requirement of prior certification to Congress proposed by the House ... [i]n order to reduce the appearance of congressional micromanagement of acquisition policy." H.R.Rep. No. 100–498, at 623 (1987). The Report stated that if Defense Department policy did not become more uniform, "more severe restrictions" would be imposed. *Id.* This carries no hint of, and indeed belies, the dramatic penalty of voiding a fully performed contract, as the panel majority now imposes.

The legislative history shows congressional concerns about the military's research and development acquisition policy, in the form of continuing review of Defense agency actions in this area and the imposition of specific and carefully considered reporting provisions. Congress did not, however, prohibit the making of fixed price R & D contracts. *Compare* 41 U.S.C. § 254(b). Instead, if Congress remained unsatisfied with agency procurement practices, Congress expressed its willingness to hold hearings and (as it did when it enacted the 1989, 1990, 1991, 1992, and 1993 Defense Appropriations Acts) to alter the reporting and internal approval obligations.

It is not the judicial role to monitor executive agency reports to Congress, or to discipline the Navy's internal compliance with the oversight actions requested by Congress.

*Cf. Longshore v. United States,* 77 F.3d 440, 443 (Fed.Cir.1996) ("Congress has undoubted capacity to oversee the performance of Executive Branch agencies, consistent with its constitutional authority. It is not for this court to instruct Congress on how to oversee and manage its creations."); *National Treasury Employees Union v. Campbell,* 654 F.2d 784, 794 (D.C.Cir.1981) (when Congress required investigation and reporting to Congress by the [Comptroller General], the court stated: "By means of this and other safeguards, Congress itself is in a position to monitor and enforce its spending limitations. It is not for us to question the effectiveness of the existing remedies and infer additional remedies . . . .") (footnote omitted).

Congress plainly did not intend that any lapse by the Navy in its compliance with § 8118, a lapse that by its nature could not have been apparent to AT & T, could be invoked, after full contract performance, to strip the Navy of authority to have entered into the contract, and to strip AT & T of the right to present any claims arising from its performance of the contract. *See John Reiner & Co. v. United States,* 163 Ct.Cl. 381, 325 F.2d 438, 440 (1963) (after award of the contract the "binding stamp of nullity" should only be imposed "when the illegality is plain").

In ruling that the Reduced Diameter Array contract is void, the Court of Federal Claims relied on an 1866 opinion of the Court of Claims. However, *Curtis v. United States,* 2 Ct.Cl. 144, 151–52 (1866), does not support the court's theory. *Curtis* involved a contract for the construction of a branch of the United States mint in San Francisco. Congress had enacted a statute limiting to $300,000 the cost to the government, and providing that "the government shall not be liable for [any] excess." When the contractor sought recovery of cost in excess of $300,000, the court stated:

> The statute became to the claimant notice in law and in fact that the expenditures could not be carried beyond certain bounds; and it was, moreover, by direct reference, stamped upon and made a part of the contract which is the foundation of the claimant's rights.

2 Ct. Cl. at 152. The court in *Curtis* did not void the contract *ab initio* because its cost was exceeded; it simply enforced the statute which limited the amount to be paid. That express provision, not lack of contracting authority, limited the contractor's recovery.

The eventual discovery by AT & T that the Navy may not have complied with the procedures of § 8118 does not invalidate the contract. Neither AT & T nor the Navy has this option. The panel majority's retroactive invalidation of the Reduced Diameter Array contract is contrary to the rules of contract, contrary to precedent, and contrary to the statute on which the majority relies. The contract was not illegal, and it was fully performed. Thus I must, respectfully, dissent from the panel majority's ruling.